Maxwell Shapiro, J.
In this rent nonpayment summary proceeding instituted by Executive Hotel Associates, a limited partnership, the petition was signed by one of the limited partners who was designated as chairman of a committee of the limited partners. The landlord, Executive Hotel Associates, is a typical real estate syndication launched on May 23, 1960 in the glowing aura of a promised return to limited partners on an investment of over $400,000', of 12% the first two years, 13% during the third year, 14% during the fourth year, and 15% regularly thereafter for the remaining period of the initial term of 25 years and to continue at 15% into a further renewal term of 25 years. One hundred and sixty-eight limited partners were drawn in. by this enticing Shangri-La only to be awakened shortly to the harsh realism that this was truly a nonexistent idyllic enterprise.
*356 Shocking indeed is the twisted course by which these limited partners were arbitrarily and in violation of basic fiduciary concepts inherent in partnerships, limited as well as general, denuded of the assets of the partnership. The genesis of this enterprise and the shameful events that followed make all the more imperative the strict and urgent enforcement of article 23-A (§ 352 et seq.) of the General Business Law, dealing with and policing the conduct of real estate syndications.
On June 1, 1959, Elm Hotel Corp. acquired a 25-year lease with a renewal option for a further 25 years, on the hotel located at 237 Madison Avenue, New York City. Elm had three principal stockholders — Jay Glatstian, Lester Bosenfeld and one Mr. Peller. Mr. Glatstian was president and Mr. Bosenfeld was vice-president. They combined in forming the limited partnership of Executive Hotel Associates. On May 23, 1960 Glatstian and Bosenfeld became the sole general partners and one Frieda Peller, the original — limited partner for the purpose of acquiring an assignment of the leasehold held by Elm. Immediately following such assignment of the leasehold and the apparent payment of $400,000 therefor to Elm on June 1, 1960, Elm took back a sublease of the hotel premises for a term coextensive with the major lease and proceeded to operate the same.
Plainly indicative of the tie-in relationships between the limited partnerships and Elm is the sublease. It was signed on behalf of the limited partnership by Glatstian and Bosenfeld as general partners who incidentally were also president and vice-president respectively of Elm, and by Frieda Peller, as acting treasurer of Elm who incidentally was the original — limited partner of the limited partnership. Under paragraph 6 of the sublease as security for the faithful performance of all the terms and conditions thereof, $25,000, together with two demand notes each for $7,500, respectively made by Glatstian and Bosenfeld individually, were deposited with the limited partnership as landlord. Provided Elm so performed each and every term of the sublease for a period of three years, then under other conditions not material here the cash security would be applied to certain uses, and the notes returned. However, substantial and grievous default did occur prior to the expiration of such period in that beginning with December, 1962, Elm as sublessee failed to pay the rent due the limited partnership. As of the commencement of this proceeding Elm owed $51,306.64 for rent from December, 1962 through September, 1963.
As a consequence of the failure of Elm to pay rent, meetings were held by small groups of limited partners with the general partners, Glatstian and Bosenfeld. These meetings culminated *357 in a general meeting of the limited partners and the general partners on March 8, 1963. The general partners took part in the discussion at this meeting. It was determined at this meeting to form a committee on behalf of the limited partners (hereafter referred to as the committee). The limited partner signing the petition in this proceeding was designated as the chairman of the committee.
Shortly after this meeting and on March 14, 1963, Rosenfeld resigned and withdrew as a general partner and simultaneously Glatstian bought Rosenfeld’s stock interest in Elm. At this juncture in the affairs of limited partnership, Glatstian was now the sole general partner, and also the president and majority stockholder of Elm, the defaulting sublessee of the limited partnership. The conflict of interest between his duties to his partners and his self-interest in Elm resolved itself in a series of maneuvers, artful in design, brazen in their execution and utterly callous to the fiduciary obligations owed to his limited partners.
When no solution was reached and the defaults in rent payments continued the committee employed counsel, who by letter dated August 14, 1963 to Glatstian demanded payment of the rent arrears emphasizing the plain conflict of interest between his role as general partner, and his stock interest and presidency of Elm. Glatstian’s reply to this demand took place on September 3, 1963, one day before this proceeding was commenced. In a most remarkable document, without notifying his limited partners or the committee, he, as the sole general partner executed a. general release in favor of Elm and a modification of the sublease substantially reducing not only future rent but also releasing the security previously deposited as protection against defaults and applying the same (less fees of counsel employed by him) against the rent arrears as reduced — and a balance of $5,133.40 still remaining was to be paid in 24 monthly installments.
This document was signed on behalf of Elm by Charles Glatstian, secretary. Charles Glatstian is the son of Jay Glatstian, the sole general partner and the president of Elm.
To choke off all possible action by the limited partners, Glatstian now adroitly administered the final blow. On September 9,1963, five days after the commencement of this proceeding, he caused a new corporation to be formed under the name of E. H. A. Successor Corp. of which he became the president and sole stockholder, and his son Charles, the secretary. On September 14, 1963, as sole general partner he assigned the leasehold to E. H. A. and executed the assumption agreement annexed thereto on behalf of E. H. A. as president.
*358 The end result of Grlatstian’s devious tactics is that by September 14,1963, not only had the limited partnership relinquished substantial obligations and security in favor of Elm, Grlatstian’s sublessee corporation, but also there was siphoned away into Grlatstian’s E. H. A. corporation the very leasehold itself.
At this point the property which launched the limited partnership was completely gone — and indeed Executive Hotel Associates was bare and denuded of the single asset for which it paid $400,000 and which gave it birth.
Grlatstian now challenges the right of the limited partnership to bring on this summary proceeding for nonpayment of rent, initially claiming that the committee chairman is not a proper party to sign a petition on behalf of the partnership.
The development of statutory law pertaining to limited partnerships began in this country in 1822 with the passage of chapter 244 of Laws of New York. Our Legislature was the first to recognize the use by the business and commercial world of this form of organization and thereafter many of our sister States patterned their acts after ours. (Partners and Limited Partners under the Uniform Acts, 36 Harv. L. Rev. 1016.)
The true character of the role of the limited partner was plainly set out in an early case: 61 The limited partner is a partner as much as the general partner, and there is nothing to prevent him even during the continuance of the partnership, from taking an active part in its concerns, if he chooses to bring on himself the statutory consequences of a liabiilty as a general partner. The statute is for his protection if he will conform to it; it is not any part of its policy to prevent him from acting as a general partner, if he is willing to assume the liabilities that follow; and if he is willing, his partners have no ground of complaint, nor the creditors of the firm, if he leave their rights unimpaired.” (Hogg v. Ellis, 8 How. Prac. 473, 474.)
This .same principle still remains in our present statute as set out in section 96 of the Partnership Law. “ A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.” (See, also, Continental Nat. Bank v. Strauss, 137 N. Y. 148.)
In the face of the sudden flood of real estate syndications to the extent where the Legislature found it necessary to pass regulating statutes, are the courts to remain sterile and unavailing to provide relief in the face of manifest wrong? The law should and does possess the power of growth, and when required *359 by circumstances challenging its forms, must tailor its procedures to meet developments in the business world outside.
But here we find support for the action of the committee chairman. If he chose to act as a general partner, and does so, he must accept the consequences^ Having done so, this court will not turn aside his effort and give countenance to blatant wrongdoing. The burdens of his choice, are for him to bear.
Technical defenses cannot change the basic object of a rent nonpayment proceeding, which is to place the landlord in a position to compel payment of his rent or be restored to the possession of his premises. Subdivision 8 of section 721 of the Beal Property Actions and Proceedings Law permits not only legal representatives to maintain a proceeding but also any “ other person so entitled to apply.5 ’ Under the flagrant and singular circumstances revealed here, the court holds the committee chairman as a person so entitled to apply so that the landlord — the limited partnership — may be able to initiate and maintain this proceeding as provided under subdivision 1 of section 721.
Before concluding, the court further directs Glatstian’s attention to his violations not only of the Partnership Law but also the limited partnership agreement. Section 98 of the Partnership Law provides:
11 § 98. Bights, powers and liabilities of a general partner.
“ (1) A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to * * *
“ (b) Do any act which would make it impossible to carry on the ordinary business of the partnership.
“ (d) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose.” (Italics supplied.)
On the basis of this record, the court finds that not only did Glatstian seriously ignore his fiduciary duties, but he committed acts proscribed by the foregoing section.
His conduct also contravened specific promises in the partnership agreement, as well as the spirit of its provisions.
“ MANAGEMENT, DUTIES AND RESTRICTIONS:
1117. During the continuance of this Partnership, the rights and liabilities of the General and Limited Partners, respectively, shall be as follows:
*360 “(a) General Partners:
“ (1) The General Partners shall have the power to sell or lease the assets of the partnership. Despite this unqualified right, the General Partners represent that it is not their intention to sell, lease or convey the property unless the written approval of limited partners owning at least two-thirds of the capital of the partnership is first obtained.” * * *
“ VOTING POWERS:
“ 21. The following voting provisions shall apply with respect to determining the affairs of the partnership :-
“ (a) Each original or successor partner shall have one vote for every $1,000. invested;
“ (b) A partner acquiring an interest of another partner shall in addition have one vote for every $1,000. interest acquired;
“ (c) Each partner shall be given at least 10 days’ notice if any meeting is called for the purpose of voting on a sale of the property or on any other question which the General Partners may deem it desirable to submit to the Limited Partners, for a vote.” (Italics supplied.)
When Glatstian assigned this leasehold to E. H. A., he did it without the knowledge or consent of the limited partnership; by so doing he made it no longer possible for the partnership to carry on its ordinary business in accordance with the sense and purposes of the partnership agreement.
■Characteristic too, is the palpably false statement made in the first preamble clause on page 3 of the September 3 release and modification agreement where it is suggested that this agreement was accomplished by and through negotiations with the limited partners.
This court should and will not be frustrated by the September 14 assignment of the leasehold and holds that this assignment was merely a device undertaken to give colorable claim to a defense that the landlord has parted with its title. This purported and belated assignment was not taken by the landlord as represented in this proceeding; hence is not deemed to be binding here.
Upon all the evidence, final judgment is directed for the landlord in the sum of $51,306.64, with ■ costs of this proceeding and a warrant shall issue accordingly within 15 days from date hereof.