William C. Hecht, Jr., J.
This action is brought by “ Biviera Congress Associates, a New York limited partnership ” (“ Associates ”), by 5 of its limited partners. The partnership consists of approximately 350 limited partners and 4 general partners —-defendants Harold Yassky, Morris A. Yassky (his father), Larry E. Goldstein and Edward S. Goldstein (his son).
The 4 general partners are the defendants, both in their individual capacities and as general partners of Mid-Manhattan Associates, another New York limited partnership. The fifth defendant is the Yassky Corporation, a New York corporation whose sole principals are the two Yassky defendants and defendant Larry Goldstein.
The complaint alleges that it is brought ‘ ‘ on behalf of Associates for the reason that all of the general partners of Associates are defendants herein and committed the wrongs against Associates complained of herein.” Associates is a typical real estate syndication which owns Biviera Congress Motor Inn (“the Motel ”), located on Tenth Avenue between 40th and 41st Streets, Manhattan.
*285 The first cause of action seeks the recovery from the individual defendants of $468,750, representing the rent for 15 months due and unpaid on the Motel from April 1, 1963 to June 29, 1964 (the date of the complaint), together with the monthly rental of $31,250 for each month thereafter. An offset is to be allowed for the net amount derived by Associates from the use of the Motel for each month from April 1,1963.
Both sides move for summary judgment.
On May 28, 1961, the Yassky Servicing Corporation (underwriters), by Harold Yassky as president, broadcast a letter to a number of investors, many of whom ultimately became the limited partners of Associates. This reads in part:
“ Dear Investor:
• ‘ ‘ After carefully reviewing a multitude of Beal Estate offerings from coast to coast throughout the United States, it is with great pleasure that we enclose herewith a Prospectus describing Biviera Congress Associates. We feel that this is one of the most outstanding new properties in New York City and, as a result should be of prime interest to you.
‘1 If you will recall, our last syndication offering of Great Bay Shore Associates, was more than 50% over-subscribed prior to the closing. Now, from all indications, our latest contribution to the Beal Estate Community should meet with even greater success * * *.
“We expect this partnership to be over-subscribed and, in that event, subscriptions will be accepted in the order of receipt * * *.
“I am indeed looking forward, with anticipation, to your participating as an integral member of our investment family. ’ ’
The capitalization of Associates was $1,608,000. The limited partners contributed $1,386,000, and defendant general partners contributed $24,000 — a total of $1,410,000. The balance of $198,000 was assigned to the general partners as a bonus, “ in consideration of their assignment to Associates of the contract for the purchase of the property.”
The purchase price of the property was as follows: $800,000 in cash; $1,600,000 by taking subject to an existing 15-year first mortgage, requiring constant annual payments of $140,000; and the balance represented by a 15-year purchase-money mortgage of $800,000, requiring constant annual payments of $56,000. The property was subject to an existing lease in which the general partners owned a 50% interest; they purchased the other 50% interest for $75,000.
*286 The $1,410,000 in cash received by Associates was disbursed: $800,000 to provide the cash portion of the purchase price; $75,000 to reimburse the general partners for their purchase of the 50% interest in the lease held by others; $385,000 for furnishing and carpeting the rooms; $40,000 to the general partners for costs and expenses; and $110,000 to the Yasslty Servicing Corporation “ for the offering and sale of all limited partnership interests, including all underwriting expenses.”
The salient provisions of the prospectus follow:
‘ ‘ The Associates will not operate the property.
“ The Yasslty Corporation will operate the property under a net lease for an initial term of 20 years with renewal options totalling an additional 79 years. The Yasslty Corporation, as operating lessee, will pay all operating expenses and the annual rent of $179,500 in addition to the amounts required to pay the amortization and interest on the mortgages, which should enable Associates to make monthly distributions to the partners at the rate of eleven (11%) per cent per annum.
“ When the Tenant’s annual net room sales exceed $1,000,000 the tenant is obligated to pay Associates additional percentage rent of 20% of the excess.
‘ ‘ The percentage rent provision in the opinion of the General Partners constitutes a protection against a rise in prices.”
The two Yasskys and Larry Goldstein, as the sole principals of the Yasslty Corporation, will contribute $50,000 to the tenant for working capital. In addition, “ to originally obtain the lease together with a franchise from Congress Enterprises, Inc., they will on behalf of the tenant pay to Congress, out of their own funds, the sum of $125,000. These payments are not to be repaid from the proceeds of the offering. It is the opinion of the General Partners that the aforementioned transactions constitute a benefit for the Associates.” This affiliation with Congress was emphasized in the prospectus. ” The tenant may assign this lease without liability only with the written consent of the General Partners, and provided the assignee assumes all obligations of the tenant. All subsequent assignments shall have the written consent of the General Partners, and shall contain a similar assumption agreement.”
The lease between Associates and the Yassky Corporation (“ the Lease”) was acknowledged on September 21, 1961, apparently the date of acquisition of the property. It ran for a term of 20 years, and provided for a net rental of $375,500 per annum ($179,500 in rent, plus $196,000 in mortgage payments), payable in equal monthly installments of $31,250, with additional rent of 20% of guest room receipts in excess of $1,000,000.
*287 Paragraph Ninth provides:
“ Tenant shall not, without Landlord’s prior written consent, assign, mortgage, pledge, hypothecate or otherwise encumber this lease or sublease the whole or substantially the whole or otherwise encumber the demised premises, (a) If the prior written consent of the Landlord is obtained as aforesaid, the assignment, in order to become effective, must provide:
“ (1) That at the time of making such assignment there is no existing and unremedied default on the part of Tenant under any of the agreements, terms, covenants and conditions of this lease on the part of Tenant to be performed as to which Landlord has served notice upon Tenant * # *.
“ (6) That the assignee shall assume in writing the due and punctual performance of all the agreements, terms, covenants and conditions on Tenant’s part to be performed from and after the execution and delivery of such assignment * * *.
“ (8) That the leased property will be operated in accordance with a franchise of Congress Inns International, which must be maintained and continued in force by such Assignee.
‘ ‘ From and after an assignment of this lease in accordance with the foregoing, Tenant named herein and any Assignee or transferee, upon making a further assignment in accordance with the foregoing, shall be released from any and all obligations of Tenant under this lease, accruing from and after the date of the execution and delivery of such assignment.”
The agreement of limited partnership, though dated May 18, 1961, was not sent out to limited partners until after they had paid their subscription. In the case of at least one of the individual plaintiffs, it was not sent until November 15, 1961.
Paragraph 16 of the agreement provides that “ the General Partners shall manage and conduct the Partnership business ” (subd. [a]). “ The General Partners in their absolute discretion have the power on behalf of the Partnership * * * to lease all or any portion of the property without limit as to the term thereof * * * whether or not the space so leased is to be occupied by the lessee or, in turn, subleased in whole or part to others ” (subd. [b]). “ The doing of any act or the failure to do any act by the General Partners, the effect of which may cause or result in loss or damage to the Partnership, if pursuant to opinion of legal counsel employed by the General Partners on behalf of the Partnership, shall not subject the General Partners to any liability” (subd. [e]).
Paragraph 17 provides: “ The Limited Partners shall take no part in, or interfere in any manner with, the conduct or control *288 of the Partnership business of the sale, leasing or refinancing of its assets, and shall have no right or authority to act for or bind the Partnership.”
On January 31, 1962, the Yassky Corporation assigned the Lease to Riviera Corporation of Manhattan. The latter was composed of the identical principals as the Yassky Corporation, both as to stockholders, officers and directors, and is alleged by defendants to have been of substantially similar financial condition.
All rents and obligations of the Yassky Corporation as tenant had been fully paid and met prior to assignment of the Lease. Riviera Corporation ‘1 assumes in writing the due and punctual performance of all of the agreements, terms, covenants and conditions on Tenant’s part to be performed from and after the date hereof,” and agreed to maintain the Congress franchise. Associates consented to the assignment.
The assignment was acknowledged for the Yassky Corporation by defendant Morris A. Yassky as vice-president. The assumption of liability was acknowledged for Riviera Corporation by defendant Harold Yassky as president. The consent was acknowledged for Associates by Harold Yassky as a general partner.
On September 4, 1962, the individual defendants as general partners formed the limited partnership called Mid-Manhattan Associates. “ The character of the partnership’s business is to acquire for investment the long term net lease of [the Motel] and to enter into a net sublease of said premises with Riviera Corporation of Manhattan as tenant.”
The limited partners of Mid-Manhattan Associates contributed $234,000. The amount contributed by defendant general partners (if any) is not stated.
On September 14, 1962, Riviera Corporation assigned the Lease to Mid-Manhattan Associates. At that time, all rents and obligations of Riviera Corporation under the Lease had been paid and met. Mid-Manhattan Associates 11 hereby assumes in writing the due and punctual performance of all of the agreements, terms, covenants and conditions on Tenant’s part to be performed from and after the date hereof,” and agreed to maintain the Congress franchise. Associates consented to the assignment.
The assignment was acknowledged for Riviera Corporation by defendant Harold Yassky as president. The assumption of liability was acknowledged for Mid-Manhattan Associates by defendant Larry E. Goldstein as a general partner. The consent *289 was acknowledged for Associates by all four defendants as its general partners.
On the same date, Mid-Manhattan Associates executed a sublease of the Motel to Riviera Corporation, its assignor. The provisions of the sublease are not stated, because the only instrument on record is the short form of sublease pursuant to section 2-91-c of the Real Property Law. It does not appear whether Associates consented to the sublease. The sublease is acknowledged for Mid-Manhattan by Larry E. G-oldstein as a general partner, and for Riviera Corporation by Harold Yassky as president.
On March 31, 1963, Mid-Manhattan Associates assigned the Lease to Midmanhattan Hotel Associates, Inc., a New York corporation. This corporation was composed of the identical principals as the Yassky Corporation and Riviera Corporation, as to stockholders, officers and directors, and is alleged by defendants to have been of substantially similar financial condition as the other two.
All rents and obligations of Mid-Manhattan Associates as tenant had been fully paid and met prior to assignment of the Lease. Midmanhattan Corporation assumed all liability under the Lease and agreed to maintain the Congress franchise. Associates consented to the assignment.
The assignment was acknowledged for Mid-Manhattan Associates by defendant Harold Yassky as a general partner. The assumption of liability was acknowledged by the Midmanhattan Corporation by Harold Yassky as president. The consent was acknowledged for Associates by all four defendants as its general partners.
On the same day, Midmanhattan Hotel Associates, Inc. assigned the Lease to Riviera Congress Associates, Inc., “ a wholly owned” subsidiary of Associates. Riviera Associates, Inc. similarly assumed all obligations under the Lease, and agreed to maintain the Congress franchise. Associates consented to the assignment.
The assignment was acknowledged for the Midmanhattan Corporation by defendant Harold Yassky as president. The assumption of liability was acknowledged for Riviera Associates, Inc. by Harold Yassky as president. The consent was acknowledged for Associates by all four defendants as its general partners.
A third document was executed on the same day. The Riviera Corporation surrendered its sublease to the Midmanhattan Corporation, and the latter released the former from any further *290 obligations with respect thereto. This surrender was acknowledged for the former by defendant Harold Yassky as its president, and the release was acknowledged for the latter by Harold Yassky as its president.
On April 12,1963, Yassky wrote to all of the limited partners of Associates as follows: “ Most of you. should be aware of the recent events which have led to a most serious decline in hotel revenues and occupancies. We wish to advise you that due to current financial losses suffered by the operating lessee, the General Partners on behalf of the partnership have accepted a surrender of the operating lease. The lessee surrendered by having the lease assigned to Riviera Congress Associates, Inc., a newly formed corporation wholly owned by the partnership.”
The stipulated rent of $31,250 per month has not been paid since April 1, 1963, although it appears that some revenue has been derived from the use of the Motel since that date. Judgment is asked against the individual defendants for each month’s rent to date (with interest thereon), and for similar relief for each succeeding month to the termination of the Lease on September 30,1981 — less, in all cases, the revenue actually received from the Motel.
The gravamen of plaintiff’s claim is that they may treat the release of liability of Mid-Manhattan Associates (the limited partnership) under the Lease as a nullity. On that premise, the individual defendants, as the general partners of Mid-Manhattan Associates, would be personally liable for the rental stipulated in the Lease. I agree with both of these contentions.
The individual defendants were in a fiduciary relationship to all of the limited partners of Associates. This is emphasized rather than relieved by the provisions of paragraphs 16 and 17 of the limited partnership agreement which have been quoted above.
It has been settled since the days of Chancellor Kent that when a fiduciary engages in a personal transaction affecting the trust estate, the cestui may nullify the transaction.
In Davoue v. Fanning (2 Johns. Ch. 252) an executor contended that it was necessary to sell testator’s real estate to pay the debts and legacies. It was purchased by a third party for the benefit of the executor’s wife. In setting aside the sale, Chancellor Kent said (pp. 260-261): “ However innocent the purchase may be in the given case, it is poisonous in its consequences. The cestui que trust is not bound to prove, nor is the Court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power, distinctly and clearly, to show it. There *291 may be fraud, as Lord Ilardwicke observed, and the party not able to prove it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does and will permit the cestui que trust to come, at his own option, and without showing actual injury, and insist upon having the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil. It is one which appears to me, from the cases which have been already cited, and from those which are to follow, to be most conclusively established ” (italics in original).
In Munson v. Syracuse, Geneva & Corning R. R. Co. (103 N. Y. 58) the court denied specific performance of a contract for the sale of land, saying, per Akdkews, J. (pp. 73-74): “ But we are of opinion that the contract of September 14, 1875, is repugnant to the great rule of law which invalidates all contracts made by a trustee or fiduciary, in which he is personally interested, at the election of the party he represents. There is no controversy as to the facts bringing the case as to Munson within the operation of the rule. He and his associates were dealing with a corporation in which Munson was a director, in a matter where the interests of the contracting parties were or might be in conflict. The contract bound the corporation to purchase, and Munson, as one of the directors, participated in the action of the corporation in assuming the obligation, and in binding itself to pay the price primarily agreed upon between the plaintiffs and Magee. He stood in the attitude of selling as owner and purchasing as trustee. The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them as far as may be impossible, knowing that real motives often elude the most searching inquiry, and it leaves neither to judge nor jury the right to determine upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand or fall * * * The value of the rule of equity, to which we have adverted, lies to a great extent in its stubbornness and inflexibility. Its rigidity gives it one of its chief uses as a preventive of discouraging influence, because it weakens the temptation to dishonesty or unfair dealing on the part of trustees, by vitiating, without attempt at discrimination, all transactions in which they assume the dual character of principal and representative.”
*292 In Wendt v. Fischer (243 N. Y. 439, 444) Judge Cardozo repeated with approval part of the foregoing quotation, and concluded: “ Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion.” It is pertinent to repeat his oft-quoted statement in Meinhard v. Salmon (249 N. Y. 458, 464).
‘ ‘ Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘ disintegrating erosion ’ of particular exceptions (Wendt v. Fischer, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.
“ The standard of loyalty in trust relations does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. Undivided loyalty is the supreme test, unlimited and unconfined by the bounds of classified transactions (City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125, 131, per Thacher, J.).
‘ ‘ One of the most fundamental duties of a trustee in any ease is complete unselfishness and inflexible loyalty to the interests of the beneficiaries of the trust. This duty stems from human frailty when confronted with conflicting interests, evidenced by the centuries-old scriptural passage: ‘No man can serve two masters’” (Matter of People [Bond & Mtge. Guar. Co.], 303 N. Y. 423, 430, per Froessel, J.).
For a recent application of this well-settled and salutary principle to real estate syndications, see Executive Hotel Assoc. v. Elm Hotel Corp. (41 Misc 2d 354, affd. 43 Misc 2d 153).
It is of no moment that all of the assignments incorporated the conditions stipulated in paragraph Ninth of the Lease. The vice was the self-dealing of the fiduciaries.
In the light of the foregoing authorities, Associates could disavow any of the consents to assignment of the Lease signed by defendants as its general partners, which consents were prerequisite to release of the respective assignors in which defendants had a personal interest. Associates likewise had the right to accept any transfers of the Lease which benefited the trust estate. As was said by Sapallo, J., in Dutton v. Willner (52 *293 N. Y. 312, 319) (cited with approval in the foregoing recent cases): “If the agent deals with the subject matter of his agency, or, by departing from the instructions of his principal, obtains a better result than could have been obtained by following them, the principal can claim the advantage thus obtained, even though the agent may have contributed his own funds or responsibility in producing the result. * * * All profits and every advantage beyond lawful compensation made by an agent in the business, or by dealing or speculating with the effects of his principal, though in violation of his duty of agent, and though the loss, if one had occurred, would have fallen on the agent, are for the benefit of the principal ” (italics supplied).
Associates thus may claim the benefit of defendants’ consent to the first two assignments, from the Yassky Corporation to Riviera Corporation and from the latter to Mid-Manhattan Associates, which vested liability for the Lease in the last-named limited partnership; and set aside defendants’ consent to the release of that limited partnership which was coupled with its assignment to the Midmanhattan Corporation. By making this election, Associates can resort to the personal liability of Mid-Manhattan’s general partners, the individual defendants herein (Partnership Law, § 98; Friedman v. Gettner, 6 A D 2d 647, affd. 7 N Y 2d 764; Seligman v. Friedlander, 199 N. Y. 373).
Liability for rental under the Lease would have remained in the Yassky Corporation, and the individual defendants would have been relieved of personal liability if they had not engaged in the maneuvers described above. For reasons of their own, they chose to shift the liability from one to another of the entities controlled by them. One of them was a limited partnership, of which they were the general partners, and where they collected $234,000 from the limited partners. Having made this choice, they cannot complain of the consequences if the cestuis choose to ratify the assignments up to the one to the limited partnership, and to disavow the subsequent assignment with the release of personal liability of the limited partnership.
But while defendants may not complain of the election made by plaintiffs, other limited partners might wish to, inasmuch as such election absolves the Yassky Corporation of liability.
It is conceivable that a judgment might be more readily collectible from it than from the individual defendants. The complaint alleges that, at the time of its assignment, the Yassky Corporation had substantial assets. While at the time of the prospectus the two Yasskys and Larry E. Goldstein were its sole stockholders, this situation may have changed, or rights of creditors may have attached, so that assets of the Yassky Cor *294 poration may not be available to satisfy judgments against the individual defendants.
The limited partners had no access to records which would have enabled them to determine whether the Yassky Corporation or the individual defendants would be more amenable to collection of judgment. While no claim for relief is made against the Yassky Corporation in the first cause of action, the same measure of relief is sought against it in the third cause of action, and the facts stated therein warrant that relief on the theory set forth therein.
However, since the liability of the Yassky Corporation is alternative to, rather than joint and several with, that of the limited partnership, the judgment shall provide for collection from the Yassky Corporation only if no collection is made from the individual defendants. Plaintiffs may determine, by examination in supplementary proceedings or other discovery, whether the best interests of the trust estate will be served by proceeding against the individual defendants or against the Yassky Corporation, and can then proceed accordingly.
Objection has been raised that the action is not properly brought in the name of “Riviera Congress Associates, a New York limited partnership,” by five of its limited partners. The Executive Hotel case (supra) upheld the right of a limited partner to bring such an action, pointing out, however, that he thereby subjected himself to the liabilities of a general partner.
The five plaintiffs here need not be compelled to- assume that risk. They have the clear right to sue in a representative capacity, on behalf of all of the limited partners (CPLR 1005). They are given leave to amend the caption to plead that they are suing in their own behalf and on behalf of all other limited partners of Associates who wish to join in the action.
Plaintiffs’ motion for summary judgment on the first cause of action is granted. Judgment may be entered against the four individual defendants: (a) for the sum of $31,250 for each month beginning with April 1, 1963, less any net sums derived in each month by Associates from the use of the Motel, with interest from each respective due date; (b) directing that a similar sum be paid by defendants on. the first day of each succeeding month; (c) permitting the same recovery against the Yassky Corporation in the event that plaintiffs elect to proceed against it instead of against the individual defendants; (d) severing the second cause of action; and (e) severing so much of the third cause of action as is directed against the individual defendants.
*295 (July 21, 1965)
Defendants urge two objections to the proposed judgment submitted by plaintiffs.
First, they object to the permission granted by the court to plaintiffs to amend the action so as to provide that it is brought by them in a representative capacity on behalf of all of the limited partners of Riviera (pursuant to CPLR 1005), instead of by the limited partnership itself as plaintiff. Defendants point out that all of the plaintiffs except Lewy had previously instituted an action for rescission in the Federal court. The objection is that the institution of such an action precludes the same plaintiffs from bringing the present action, which is predicated on the premise that they are still limited partners.
There are three answers to this objection, any one of which is enough to defeat defendants’ contention.
First, Lewy did not bring any action for rescission. His right to bring the representative action is clear.
Secondly, as to the other plaintiffs: The whole doctrine of election of remedies by the mere institution of an action has lost most of its vitality since the enactment of section 112-e of the Civil Practice Act, since re-embodied in CPLR 3002 (subd. [e]). (See Schenck v. State Line Tel. Co., 238 N. Y. 308 [Cardozo, J.]; Clark v. Kirby, 243 N. Y. 295 [Crane, J.]; 3 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 3002.02-3002.04.)
Finally, even if the former doctrine of election of remedies were still in effect, it would have no application here. There is no inconsistency between an action by limited partners in their individual right to rescind their purchase, and an action brought by them in the right of the partnership to recover rent due to the partnership. The latter action belongs to the partnership, and not to the individuals who are asserting it in a representative capacity. True, if any of these plaintiffs should subsequently lose his status as a limited partner by virtue of a judgment of rescission, he could be dismissed as a party plaintiff. But until such judgment is rendered he has the right to prosecute such claim on behalf of the partnership.
The second objection to the proposed order is that the defendant Yassky Corporation was not named as a defendant in the first cause of action, and was at no time afforded an opportunity to assert any defenses which the said corporation had against Riviera, such as money due to the Yassky Corporation from Riviera as and for advances, the existence of which is alleged to appear in balance sheets of Riviera.
No such offsets were pleaded in the answer of the Yassky Corporation to the third cause of action, nor is any proof thereof *296 submitted in the affidavit in opposition to the proposed judgment. However, since the motion for summary judgment was confined to the first cause of action and did not put the Yassky Corporation on notice that such relief would be sought against it under the prayer for other and further relief, that corporation should have the right to plead and prove any offsets which it might have against Riviera, in the event that collection should be attempted from the Yassky Corporation pursuant to the alternative provision of the judgment herein.
The judgment submitted by plaintiffs is modified accordingly, and is signed.