Seymour SHLOMCHIK, a limited partner in Richmond 103 Equities Co., a New York Limited Partnership, for himself and on behalf of the partnership, Plaintiff,

v.

RICHMOND 103 EQUITIES CO., a New York Limited Partnership, and William S. Hack and Pearl H. Hack, individually and as general partners of Richmond 103 Equities Co., a New York Limited Partnership, Defendants.

No. 84 Civ. 0053 (BN) (GLG).

United States District Court, S.D. New York.

Dec. 15, 1986.

Bush, Grafman & von Dreusche, a Professional Corp. (Karen A. von Dreusche, of counsel), Bala Cynwyd, Pa., for plaintiff.

Law Offices of Sol Freedman (Sol Freedman and Michael Margello, of counsel), New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERNARD NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge, by designation:

### Introduction

Dr. Seymour Shlomchik, a limited partner in Richmond 103 Equities Co. ("R 103"), a New York limited partnership, seeks recovery of damages from William S. Hack and his wife, Pearl H. Hack, individually and as general partners of R 103.

Plaintiff asserts two types of causes of action: (1) derivative claims brought on behalf of R 103 pursuant to New York Partnership law § 115–a; and (2) individual claims brought by plaintiff on his own behalf.

Specifically, plaintiff's derivative causes of action, as set forth in the first three counts of the complaint, are: (1) failure to properly manage R 103 resulting in waste; (2) breach of fiduciary duty; and (3) common law fraud. The individual causes of action, as set forth in counts V through IX of the complaint, are: (1) failure to make cash flow distributions; (2) common law fraud; and (3) fraud in the purchase or sale of securities in violation of the federal and state securities laws.[1] These derivative and individual claims are based essentially on the same set of facts, as follows.

### Facts

On January 1, 1973 plaintiff and eight other investors entered into an agreement of limited partnership relating to R 103. That agreement provides, *inter alia*, that "[t]he purpose of the partnership is to acquire the land, buildings and improvements at the premises at 42–72 80th Street, Elmhurst, Queens, New York, and of leasing said · premises" (paragraph 3); that the term of the partnership would be from January 1, 1973 to December 31, 2012, unless certain events occurred, *i.e.*, "the divesting by the partnership of all interests it may have in said premises, and of any asset it may receive resulting from a sale, exchange or other disposition of said property" (paragraph 4); that the Hacks would be the general partners (paragraph 5);[2] that plaintiff would have a 9.8 percent share of the profits and losses (paragraph 10);[3] and that plaintiff's capital contribution to R 103 would be $40,000 to be paid in six installments (paragraph 7). Hence, plaintiff's total contribution to R 103 was $40,000, which amount was paid in full.

Investment in R 103 was recommended to plaintiff by his attorney, Philip Shiekman of Pennsylvania, who was a close personal friend of Hack, an experienced real estate and tax attorney, and a real estate tax shelter promotor. Sheikman furnished plaintiff the proposed partnership agreement and a proposal prepared by Hack describing the investment in R 103 as "an apartment house with 103 apartments in

---

1. Plaintiff's individual claims were initially asserted on behalf of himself and all the other limited partners of R 103 as a class pursuant to Fed.R.Civ.P.Rule 23.1. Class action status was opposed by some of the other limited partners of R 103 and the action was joined by none. By order dated October 5, 1984, Judge Goettel denied plaintiff certification as representative of the proposed class, and there are now no class action claims before the court.

2. Defendant Pearl Hack did not play an active role in the operation or management of R 103;

all references to "Hack" in this opinion refer solely to defendant William S. Hack. However, when the term "defendants" is used herein, such term refers solely to the Hacks and excludes R 103.

3. Seven other limited partners also had a 9.8 percent interest, while one limited partner had a 19.6 percent interest. The general partners each had a 1 percent share of the profits and losses of R 103.

Elmhurst, Queens, New York" (hereinafter referred to as "the Richmond"). The proposal presented the anticipated cash flow and tax losses per unit to the partners, and also disclosed that acquisition of the Richmond would involve a $2,250,000 wraparound mortgage and net lease for 25 years. Further, the proposal stated that the performance of the wrap-around mortgagee and net lease tenant would be personally guaranteed by Messrs. Aaron Zeigelman and William Langfan (hereinafter referred to as "Z & L"), Hack's longtime friends and business associates.

Prior to investing in R 103, plaintiff did not inspect the Richmond, see the neighborhood in which it was located or obtain an appraisal report covering the property. In point of fact, plaintiff had no idea as to the value of the Richmond in 1973; he invested in R 103 primarily as a tax shelter. In 1973, plaintiff was in (at the least) a 50 percent tax bracket and the partnership offered "three for one tax write-offs". Interestingly, plaintiff invested in at least four other tax shelter limited partnerships in which Hack was a general partner and the "moving spirit".

On or about July 1, 1973, R 103 acquired the Richmond from a Z & L affiliate and gave such affiliate a $2,250,000 wraparound mortgage, which "wrapped around" the existing first and second underlying mortgages on the property. Further, R 103 entered into a net lease of the Richmond to a corporate entity principally owned by Z & L, which net lease tenant operated the Richmond apartment building. As previously mentioned, Z & L personally guaranteed the performance of the wraparound mortgagee and the net lease tenant.

The partners' capital contributions to R 103 were used primarily to pay the interest on the wrap-around mortgage. Under that mortgage, R 103 was credited with the rents from the Richmond, and the wraparound mortgagee made the payments on the underlying mortgages. The wraparound mortgagee was also obligated to

pay Shawnee Equities (Hack's wholly-owned corporation) commissions for Hack's services to R 103.

From 1973 to August 26, 1977, plaintiff received from R 103 the cash flow distributions projected in the proposal. Thereafter, plaintiff received no further cash distributions from R 103 except a payment in June 1979 in the amount of $3,307.50. Hack sent the latter payment to plaintiff with an accompanying letter explaining that the payment was actually a "nonrecourse loan" from Hack. Plaintiff did not repay this loan to Hack.

After cash flow distributions ceased, plaintiff made periodic inquiries of Hack by letter and telephone during a 5–year period from 1977 to 1982 concerning the reasons why distributions had not been made and seeking to elicit information as to the financial affairs of the partnership. Hack failed to reply to many of plaintiff's inquiries. In response to one inquiry, however, Hack explained to plaintiff that R 103 was having cash flow difficulties and that cash flow could not be distributed to the partners until it was received. Plaintiff demanded to know why, if R 103 was having cash flow problems, Hack was not legally pursuing the net lessee and Z & L, the guarantors. Additionally, upon being informed by Hack that the net lessee had defaulted under the lease, plaintiff demanded that Hack declare the net lessee in default, take the property back, and operate the Richmond as a landlord or property manager. Moreover, after cash flow distributions ceased, plaintiff repeatedly demanded to examine R 103's books and records, but Hack did not make them available to plaintiff until 1982.

Hack's testimony establishes, without contradiction, that in 1975 the New York real estate market was depressed, Z & L had seriously overextended themselves in their real estate investments and were losing properties through foreclosure. In a word, the Z & L financial empire was on the verge of collapsing.[4]

---

**4.** In 1975, Hack had approximately eight other tax shelter limited partnerships with Z & L. They had defaulted in the payment of cash flow in all of these other limited partnerships, as well.

Hack discussed enforcement of their guarantee with Z & L who threatened Hack with their bankruptcy. At the trial, Hack explained it was his firm conviction that the pursuit of legal proceedings against Z & L upon their personal guarantees would have resulted in their bankruptcy and ultimately the foreclosure of the wrap-around mortgage on the Richmond. Hack informed plaintiff that, as a practical matter, R 103 had nothing to gain by pursuing either the net lessee or the guarantors since such action would precipitate foreclosure of the wrap-around mortgage, which from a tax standpoint, would be disastrous to the limited partners.

According to Hack's testimony, in 1976 the Richmond could not have been sold at a price sufficient to pay off the wrap-around mortgage, and by foreclosure, R 103 would not only have lost the Richmond, but the limited partners would also have suffered serious tax recapture of both capital gains and ordinary income at least equal to the total amount of the deductions theretofore taken by them of approximately $1,000,000. Hack stressed he strongly believed that foreclosure of the mortgage and severe adverse tax consequences would have resulted by pursuing Z & L on their guarantee by legal process.

Significantly, in April 1976, without the knowledge or consent of the limited partners and in furtherance of his plan to preserve the tax shelter benefits of the partnership, Hack arranged for the "tax-free exchange" of the Richmond for a substitute property, a 37.6 percent interest in an apartment complex in Yonkers known as Glenwood Gardens. The remaining 62.4 percent interest in Glenwood Gardens was acquired by four other real estate limited partnership tax shelters in which Hack was the general partner. Hack utilized five wrap-around mortgages totaling $5,980,-000, each mortgage being in the amount of the percentage interest held by each of the five limited partnerships acquiring an interest in Glenwood Gardens. Hack testified convincingly that his only motivation for consummating the exchange of the Richmond for Glenwood Gardens was to avoid the imminent foreclosure of the wrap-around mortgage on the Richmond, and the consequential tax recapture which would have adversely impacted all the limited partners.

Hack's *modus operandi* for the 1976 tax-free exchange was: a third party purchased Glenwood Gardens at the same closing in which Glenwood would then be exchanged for the Richmond. The third party would then dispose of the Richmond. Thus, through the use of a third party, Hack was able to "exchange" the Richmond for Glenwood Gardens and hopefully obviate a tax liability that would have been incurred by directly selling the Richmond and directly purchasing Glenwood Gardens.

The danger to R 103 of the third party exchange was that the partnership might be deemed by the Internal Revenue Service to be a "seller" of the Richmond and a "buyer" of Glenwood Gardens. According to Hack, an experienced tax attorney, he determined to minimize this risk by avoiding any communications with the limited partners disclosing the exchange of properties thus reducing the potential for scrutiny of the transaction by the Internal Revenue Service.

A total of eight properties involving eight limited partnerships and approximately eighty limited partners were affected by the 1976 third party exchange. In order to effectuate the third party tax-free exchange, Hack advanced $200,000 of his personal funds which were used by the "third party" to purchase Glenwood Gardens. The $200,000 advance was repaid to Hack.

The 1976 exchange involved the payment by Z & L (through their affiliate Mari Corp.) to R 103 of $225,000. After an initial down payment on the $225,000, Mari Corp. executed a note and mortgage in the amount of $168,750 for the balance due R 103. Hack returned the note and mortgage to Z & L after being paid only $89,242.74 (half the amount due), and relinquished payment of the balance. Also involved in the 1976 exchange of properties was a release given by Hack to Z & L from their guarantee of the wrap-around mortgage and net lease of the Richmond.

The record also shows that Hack, through his wholly-owned corporation Shawnee Equities, received payments totaling $114,090.14 during 1976 and 1977 for effecting the Glenwood Gardens transaction.

From 1973 through and including 1976, plaintiff received tax deductions totaling $71,981, which closely approximated the amount of tax losses per unit projected in the proposal. From 1977 through and including 1983, plaintiff received tax deductions totaling $52,605, which were $12,601 more than originally projected in the R 103 proposal.

In March 1982 and after numerous demands by plaintiff, Hack for the first time made available to plaintiff and his attorney certain books and records, including tax returns of R 103. Plaintiff learned from these records of the earlier 1976 exchange and that the partnership no longer owned the Richmond, but instead owned a 37.6 percent interest in Glenwood Gardens.

## Opinion

### I.

Initially, the court will consider defendants' contention that plaintiff's class causes of action were interposed for the collusive purpose of establishing federal diversity jurisdiction where none exists.

Defendants argue that since a limited partnership has "entity" status under the law of New York, plaintiff improperly claims diversity jurisdiction by basing it solely on his own residence in Pennsylvania while disregarding the residence of the other eight limited partners, some of whom reside in New York. Further, defendants posit that plaintiff attempted to bring this case as a class action under Fed.R.Civ.P. Rule 23.2 merely for the "collusive purpose of establishing [federal] diversity jurisdiction" (Deft's brief at 21).

However, the court agrees with plaintiff's contentions: (1) that defendants have not established (or even suggested) what the claimed "collusion" consisted of; (2) that the limited partners of R 103 have no "entity" status under New York law; (3) that federal diversity jurisdiction is properly predicated upon the parties of record

inasmuch as plaintiff is a resident of Pennsylvania and defendants are residents of New York; (4) that there is diversity between plaintiff and R 103 pursuant to the authority of *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.1966) (where there was diversity between plaintiff and the general partners of defendant limited partnership, the identity of citizenship between plaintiff and a limited partner of defendant did not destroy diversity jurisdiction); (5) and that for purposes of diversity jurisdiction in this case, there is no basis for realigning R 103 as a plaintiff and thereby defeat the diversity that exists as a result of R 103's position as a named defendant. *Cf. Smith v. Sperling*, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); *Swanson v. Traer*, 354 U.S. 114, 77 S.Ct. 1116, 1 L.Ed.2d 1221 (1957).

■ Essentially, then, defendants' contention that the court lacks federal diversity jurisdiction in this case is without merit. More, this court has federal question jurisdiction in conformity with 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, as to plaintiff's cause of action under 15 U.S.C. § 78j(b) and Rule 10b–5.

### II.

Turning now to the merits, the court addresses the issues arising from the 1976 exchange of the Richmond for Glenwood Gardens.

Plaintiff contends that the exchange of properties constituted waste, breach of fiduciary duty and fraud on the partnership and the limited partners. Hack, on the other hand, insists that he acted within his authority under the partnership agreement and the New York Partnership Law in effecting the exchange, and thus the exchange did not require the limited partners' knowledge, consent or ratification. Further, Hack maintains that he did not commit waste, mismanage the partnership assets or breach his fiduciary duty to the partnership and limited partners, since: (1) the tax-free exchange was made in good faith for a legitimate partnership purpose; (2) the exchange preserved the partnership

and its tax shelter benefits to the limited partners by avoiding an inevitable default on the wrap-around mortgage and foreclosure thereof; and (3) the exchange of properties was a "good business move" and one protected from attack under the Business Judgment Rule. Hack also insists that he was acting in good faith without any intent to defraud, and he had no obligation to disclose the exchange to the limited partners. Finally, Hack argues that plaintiff failed to prove that the exchange resulted in any loss in the value of the partnership's assets or plaintiff's interest in R 103.

■ At the outset, the court must determine whether the exchange of properties was authorized by either the partnership agreement and certificate or by the New York Partnership Law. The court has concluded that its answer must be in the negative.

As previously noted, paragraph 3 of the partnership agreement provides: "The purpose of the partnership is to acquire the land, buildings and improvements at the premises at 42–72 80th Street, Elmhurst, Queens, New York, and of leasing said premises". Moreover, the Certificate of Limited Partnership states: "The character of the business to be carried on by the limited partnership shall be the acquisition of the land, buildings and improvements located at 42–72 80th Street, in the County of Queens, City of New York, State of New York, and the leasing of said land, buildings and improvements." Importantly too, the proposal mentions only the Richmond as the asset to be acquired and operated by R 103.

Paragraph 4 of the partnership agreement confers authority on the general partners to divest the partnership of assets acquired through a sale or exchange in the course of dissolving and terminating the partnership prior to the expiration of the term of the partnership. The record is clear that Hack exchanged the Richmond for an interest in Glenwood Gardens for reasons other than the dissolution and termination of the partnership. Moreover, the managerial duties of the general partners, as set forth in paragraph 14 of the partnership agreement, contains no suggestion whatever of any authority to divest the partnership of the Richmond for the purpose of acquiring a substitute property. By exchanging the Richmond for Glenwood Gardens, Hack made it impossible for R 103 to carry out its sole-stated purpose, and the exchange destroyed the character of R 103's business, as expressed by paragraph II of the partnership's certificate. *Cf. Executive Hotel Assoc. v. Elm Hotel Corp.*, 41 Misc.2d 354, 245 N.Y.S.2d 929 (Civ.Ct. 1964), *aff'd*, 43 Misc.2d 153, 250 N.Y.S.2d 351 (App.Term 1st Dep't.1964). Consequently, by the exchange of properties without the consent or ratification of the limited partners, Hack—although acting in good faith to avoid mortgage foreclosure and tax recapture—not only violated the terms of the partnership agreement and certificate, but also exceeded his authority under the New York Partnership Law, section 98.[5]

As a predicate of their authority in the partnership agreement for the exchange of properties, defendants point to the language "sale, exchange, or other disposition" in paragraph 4 of the partnership agreement and the same language in paragraph V of the partnership certificate. But as heretofore mentioned, these provisions in the agreement and certificate relate solely to the term of the partnership and the divestment of assets acquired through a sale or exchange *in the dissolution of the partnership*, and plainly do not authorize an exchange of properties in the ordinary conduct of the partnership's business. In view of the purpose of R 103, as explicitly

---

**5.** This section, so far as pertinent, provides:

(1) A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to

(a) Do any act in contravention of the certificate.

(b) Do any act which would make it impossible to carry on the ordinary business of the partnership.

stated in the partnership agreement and certificate to acquire and lease the Richmond, and the absence of any authority in paragraph 14 of the agreement (setting forth the management duties of the general partners) for substituting some other property for the Richmond, the court will not read into paragraph 4 any authority for the 1976 exchange.

Also, in an apparent "grasping at straws", defendants directed the court's attention to paragraph 24 of the partnership agreement, which in essence authorizes the general partners to transfer the assets of the partnership to a trust or corporation, provided *inter alia,* that "the interests of all the partners *and of Partnership assets remains the same* " (emphasis added). Additionally, paragraph 24 empowers the general partners to change the form of the entity holding the partnership's assets in ways other than the transfer of assets to a trust or corporation. Palpably, paragraph 24 relates solely to changing the legal *entity* holding the Richmond property and has nothing to do with exchanging the assets of the partnership for other assets. Indeed, paragraph 24 makes it abundantly clear that any change in the form of the entity holding the assets (*i.e.* from partnership to corporate form) *may not involve any change in the assets themselves.*

The short of the matter is that there is nothing in the partnership agreement, certificate or the New York Partnership Law that authorized the exchange of properties in 1976 without the consent or ratification of the limited partners.

### III.

The court must now determine what damages, if any, should be awarded plaintiff on his derivative and individual causes of action relating to the unauthorized exchange of properties in 1976. On that score, the issues are: (1) whether the partnership or plaintiff individually suffered any damage because of the unauthorized exchange; and (2) if so, whether "price appreciation" damages, as urged by plaintiff, is appropriate in this case.[6]

The derivative causes of action for waste, breach of fiduciary duty and fraud all revolve around the same facts regarding Hack's failure to pursue Z & L on their guarantee of the net lease and wraparound mortgage, and Hack's improper action in exchanging the Richmond for Glenwood Gardens. Plaintiff contends that compensatory damages for the three causes of action should be predicated on its evidence adduced at trial concerning the difference in value in 1985 between the Richmond and Glenwood Gardens since "R 103 has been deprived of the value of its investment in the Queens property" (Pltf's brief at 21).

Defendants, on the other hand, vigorously urge that plaintiff incurred no damages by reason of the exchange since the exchange avoided foreclosure of the wraparound mortgage and preserved the tax shelter benefits of the partnership; and in any event, plaintiff's evidence concerning the market values of the Richmond and Glenwood Gardens in 1985 is irrelevant in measuring damages.

In 1973, the investors in R 103 made a highly leveraged and obviously speculative investment in the Richmond with the tax shelter benefits of the partnership the primary, if not the sole, inducement. Indeed, counsel for plaintiff points up that the wrap-around mortgages on the Richmond and Glenwood Gardens were inflated to generate large interest payments and deductions for tax shelter purposes (Pltf's reply brief at 10). In view of the $2,250,000 wrap-around mortgage, it is very re-

6. Plaintiff's appraisal expert testified that as of November 14, 1985, the Richmond had a market value of $2,400,000 to $2,500,000 while as of December 19, 1985 Glenwood Gardens had a market value of $4,200,000 to $4,500,000. Accordingly, R 103's 37.6 percent interest in Glenwood Gardens had a market value of $1,579,000 to $1,692,000 as of December 19, 1985. On the basis of the difference in market values of the Richmond and Glenwood Gardens in 1985, plaintiff asks compensatory damages of at least $808,000 on the derivative causes of action and of at least $79,184 on the individual causes of action.

mote that R 103 acquired any equity in the Richmond in 1973.[7]

The record shows that in 1976, the net lease tenant of the Richmond was in default, the real estate market in New York was depressed, the guarantors (Z & L) were threatening Hack with their bankruptcy if he pressed them on their guarantee, and there was imminent risk of foreclosure of the wrap-around mortgage, which could have resulted in tax recapture for the limited partners. Considering the gloomy prospects for R 103 in early 1976, it is difficult to see how the partnership or plaintiff were damaged by the tax-free exchange, since loss of the property through foreclosure of the mortgage was thereby avoided and the tax shelter structure of the partnership was salvaged.

In any case, Hack acted in good faith in making the exchange, and therefore any difference in the appreciation of market value between the Richmond and Glenwood Gardens since 1976 should not be regarded as an element of compensatory damages in this case.

The assessment of so-called "price appreciation" damages is particularly unwarranted in the present case where there is no credible evidence that in 1976 plaintiff had, or reasonably could have had, any expectation of significant appreciation in the market value of the Richmond. The testimony of plaintiff's appraiser clearly establishes that even as late as 1979, some six years after R 103 acquired the Richmond and plaintiff made his investment in the partnership, property values in Elmhurst, Queens at best remained "stable" or "essentially level" (Tr. 111, 130); that during the middle 1970's, New York City was in the midst of a fiscal crisis and was "faced with a depreciated real estate market" (Tr. 119); that rental buildings in Elmhurst, including the Richmond, were severely impacted by rent control and stabilization in the face of escalating inflation, especially with respect to the price of fuel (Tr. 119–120); and that cooperative and condominium conversions had not yet come on the scene (Tr. 132). Under these circumstances, familiar to everyone interested in investing during the 1970s in New York real estate, there could not have been any reasonable expectation by plaintiff in 1973 of significant price appreciation for the Richmond.

It should be stressed that when plaintiff made his investment in 1973, he exhibited little, if any, concern for the market value of the Richmond. Thus, plaintiff made no personal inspection of the property and indeed had never even visited Elmhurst where the property was located. Moreover, prior to his investment, plaintiff's sought no appraisal or other evidence of the value of the Richmond, despite the fact that Hack furnished the limited partners with no representation whatever concerning the market value of the property.

For the foregoing reasons, there is no justification for assessing "price appreciation" damages against the general partners for the unauthorized exchange of properties.[8]

### IV.

■ In light of the circumstances confronting the general partners in 1976—the threat of imminent default by the wrap-around mortgagee and foreclosure of that mortgage and the consequential loss of the tax shelter benefits of the partnership—the court finds that Hack did not mismanage R 103, "waste" the partnership assets or breach his fiduciary duty to the limited partners by failing to pursue legal proceedings against the net lease tenant and the guarantors. Whether pursuit of the net lease tenant and guarantors by legal proceedings would ultimately have proven fruitful or self-defeating in terms of the best interests of *all* the limited partners, was a business judgment that the general

---

7. According to the testimony of plaintiff's appraisal expert, the Richmond had a market value of $2,400,000 to $2,500,000 in November 1976, and he indicated that the market value of the Richmond had appreciated at least 50 percent since 1976 (Tr. 131).

8. Plaintiff offered no evidence concerning the difference in values of the Richmond and Glenwood Gardens at the time of the exchange in April 1976, which defendants insist is the relevant point in time for fixing any compensatory damages in connection with the exchange.

partners were obligated to make in the exercise of good faith and reasonable diligence under the existing circumstances. The court finds no failure by defendants on that score.

Hack testified, without contradiction, that due to the well-known precarious financial condition of the guarantors in the 1975–76 period, legal proceedings against them would have been futile and precipitated their bankruptcy. Further, according to his testimony, Hack determined that because of the deepening default of the net lease tenant of the Richmond, there was a substantial risk that the limited partners would incur "recapture" of capital gain and ordinary income as a result of foreclosure of the wrap-around mortgage, the payment of which depended entirely upon receipt of rent from the net lessee. Being unable to negotiate payment from Z & L, who had guaranteed both the net lease and the obligations of the wrap-around mortgagee, and having been threatened by them with bankruptcy—an event which probably would have precipitated foreclosure of the mortgage—Hack determined to effect the third party tax-free exchange.

Although as discussed above, the exchange itself was executed without authority, it served to salvage the tax shelter benefits that had theretofore accrued to the limited partners. Moreover, the exchange preserved the future tax deductions taken by the partners, which as it turned out, actually increased and substantially exceeded those originally projected in the proposal by some 31.5 percent from 1977 through 1983.

The court, therefore, finds that under all the facts and circumstances defendants did not commit waste or breach their fiduciary duty by not taking legal action against the net lease tenant and the guarantors of the net lease and wrap-around mortgage.

## V.

■ The court agrees with defendants that under the circumstances of this case, they have no liability for failure to pay the limited partners cash flow distributions after August 1977. Although it is true that cash distributions were projected in the proposal, such projected distributions depended upon the payments from the net lease tenant (or the guarantors) who defaulted. The general partners did not personally guarantee the projected cash flow. For the foregoing reason, as well as the circumstances discussed in part IV, *supra,* the court finds that the general partners have no liability for failure to make cash distributions after August 1977.[9]

## VI.

■ Plaintiff's individual causes of action predicated on common law fraud and securities law violations may be quickly disposed of. Although Hack was misguided concerning his authority to consummate the 1976 exchange without the knowledge and consent of the limited partners, the court finds that Hack had no intent to defraud plaintiff or the partnership and there is no credible evidence of any deceit or manipulation revolving around the exchange. Absent scienter or intent to deceive, manipulate or defraud, a private cause of action for damages under 15 U.S.C. § 78j(b) and Rule 10b–5 will not lie. *Ernst & Ernst v. Hochfelder* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Accordingly, plaintiff is not entitled to recover damages against the general partners on his individual causes of action predicated on common law fraud and violation of the securities laws.

## VII.

■ Plaintiff seeks recovery from defendants on behalf of the partnership of

9. As noted *supra,* Hack sent plaintiff a check for $3,307.50 on or about June 15, 1979 accompanied by a letter explaining that the payment was a "non-recourse loan" from Hack, which loan plaintiff would be required to repay only out of cash flow received from R 103 after June 15, 1979. Hack's letter also advised plaintiff that $3,307.50 was "the amount of cash flow which would have been distributed to you through January 1979, if such cash flow had been received from the net lessee of the property owned by the Partnership" (Pltf's exh. O). There is no indication in the record that plaintiff repaid this loan to Hack.

$89,242.74 owing R 103 on a note and mortgage executed by the Mari Corp. securing a debt of $168,750, which represented the balance due on $225,000 Mari Corp. agreed to pay R 103 in the course of the 1976 exchange. Hack, as president of Kale Holding Co., returned the note to Mari Corp., a straw corporation used by his business associates Z & L, after it had only been half paid.

Defendants do not dispute, and in fact do not even mention in their brief or proposed findings of fact, the foregoing transaction between Hack and Mari Corp. Moreover, defendants have offered no reasons or justification for the relinquishment of the $89,242.74 owing to R 103 and the record fails to establish that such relinquishment was necessary or justified.

Accordingly, the court finds that plaintiff is entitled to recover from defendants on behalf of R 103 the $89,242.74 relinquished on the Mari Corp. note and mortgage.

## VIII.

■ The limited partners of R 103 never agreed that fees or commissions of any kind would be paid to Shawnee Equities (Hack's wholly-owned corporation) in connection with any transaction other than the acquisition of the Richmond. Hence, under all the circumstances, the court finds that the fees paid to Shawnee in connection with Glenwood Gardens involved improper self-dealing by Hack and a breach of fiduciary duty to the partnership. The appropriate remedy for such breach of fiduciary duty is to require the fiduciary to disgorge the improper payments or fees received. *Delano v. Kitch*, 663 F.2d 990 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).

Documents relating to the exchange of properties indicate that payments were made to Shawnee Equities in the total amount of $114,090.13 during the brief period of May 1, 1976 through February 1, 1977 (Pltf's exh. DDD at 610), which was prior to the time when cash flow from Glenwood Gardens ceased in January 1978 (Tr. 441).

The court, therefore, finds that plaintiff is entitled to recover on behalf of R 103 the $114,090.13 received improperly by defendants in connection with the exchange of properties.

## IX.

■ Plaintiff further seeks an accounting relative to the numerous transactions between R 103 and Shawnee Equities that are evidenced by the checkbook maintained by Hack for R 103. These transactions in many instances were identified on the checkbook stubs as a "loan" or were unidentified as to the nature of the transaction. Hack's testimony at trial did not satisfactorily elucidate the nature of the foregoing transactions recorded in R 103's checkbook. Bluntly put, Hack's record keeping on behalf of the partnership, to say the least, was deplorable, and violated even the most rudimentary duty of any fiduciary to keep accurate and complete records concerning transactions entrusted to him. Plaintiff's request for an accounting of the transactions between R 103 and Shawnee Equities, as evidenced by the checkbook stubs, is eminently reasonable and therefore is granted.

## Conclusion

For the foregoing reasons, it is hereby ORDERED, ADJUDGED AND DECREED that:

(1) Plaintiff's request for damages on his derivative causes of action in the amount of at least $808,000, predicated on the difference in the appraised market values of the Richmond and Glenwood Gardens as of November and December 1985, is denied.

(2) Plaintiff's request for damages on his individual causes of action in the amount of at least $79,184, predicated on his percentage share (9.8 percent) of the $808,000 difference in the appraised market values of the Richmond and Glenwood Gardens as of November and December 1985, is denied.

(3) Plaintiff's request for damages on his individual causes of action in the amount of $21,168, representing the cash flow distributions projected in the Richmond proposal

from 1978 to 1986 but which have not been paid to plaintiff, is denied.

(4) Plaintiff's request for damages on his derivative causes of action in the amount of $89,242.74, predicated on the balance owing R 103 on a note and mortgage executed by Mari Corp., which balance was improperly relinquished by defendants, is granted, with interest.

(5) Plaintiff's request for damages on his derivative causes of action in the amount of $114,090.13, representing fees improperly received by Shawnee Equities in connection with the 1976 exchange of properties, is granted, with interest.

(6) Plaintiff's request for an audit and accounting of the transactions between R 103 and Shawnee Equities recorded in the partnership's checkbook stubs is granted. For purposes of such accounting, this court will, in compliance with 28 U.S.C. § 636(b)(2), designate a magistrate to serve as a Special Master to hear and report.

(7) Plaintiff's request for reasonable expenses, including attorney's fees, in accordance with New York Partnership Law, section 115-a(5), in an amount to be determined by the court upon application subsequent to this decision, is granted. Plaintiff is directed to account to the partnership for the remainder of the proceeds recovered by him from defendants in this law suit.

(8) Plaintiff's request for the appointment of a receiver for R 103 is denied.

(9) Plaintiff's request for punitive damages is denied.

(10) Defendants' request for Fed.R. Civ.P. Rule 11 sanctions against plaintiff and his counsel is denied.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. Rule 52(a).

Counsel for the parties are directed to settle a final judgment on 15 days notice consistent with the foregoing opinion, findings of fact and conclusions of law.