Howard C. HIRSCH et al.,
Plaintiffs,

v.

Edmond duPONT et al., Defendants.

No. 72 Civ. 775.

United States District Court,
S. D. New York.

June 9, 1975.

Shea, Gould, Climenko & Kramer, New York City by Sheldon D. Camhy, New York City, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, New York City by Russell E. Brooks, New York City, for defendant New York Stock Exchange.

Cahill, Gordon & Reindel, New York City by David R. Hyde, James P. Tracy, New York City, for defendants Haskins and Sells.

## OPINION

ROBERT L. CARTER, District Judge.

### I.

The amended complaint alleges in substance that defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), in connection with the purchase by plaintiffs and sale by certain defendants of general and limited partnership interests in F. I. duPont, Glore Forgan & Co. Common law claims based on pendent jurisdiction are also asserted. In May, 1974, plaintiffs entered into a settlement with all defendants except the New York Stock Exchange, Inc. ("Exchange") and Haskins and Sells, an accounting firm. The Exchange and Haskins and Sells now move for summary judgment dismissing the federal securities laws claims of plaintiffs Paul L. Kohns and Marshall S. Mundheim, primarily on the ground that the general

partnership interests purchased by them [1] were not "securities," as defined in § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and § 2(1) of the Securities Act, 15 U.S.C. § 77b(1). No motion is made with respect to plaintiff Howard C. Hirsch, who received only limited partnership interests.

*The Amended Complaint*

The amended complaint alleges that prior to July, 1970, plaintiffs were general partners of Hirsch & Co., a brokerage firm; that on or about July 2, 1970, pursuant to written agreement, Hirsch & Co. was liquidated and its assets were transferred to defendant Francis I. duPont & Co. ("duPont") and then to defendant F. I. duPont, Glore Forgan & Co. ("duPont Glore"), a successor partnership to duPont; and that as part of the transaction, duPont and duPont Glore "offered for sale and sold to * * * the plaintiffs herein certain securities consisting of general and limited partnership capital units of F. I. duPont, Glore Forgan & Co." It is further alleged that in connection with this transaction, all defendants knowingly made untrue statements and omitted to state material facts concerning duPont's compliance with Exchange capital requirements, its net worth and sources of capital, and its "back office" difficulties and problems with customers' accounts. It is alleged that the Exchange and Haskins and Sells, who were auditors to both Hirsch & Co. and duPont, failed to disclose these matters; that the Exchange expressly approved and encouraged the transaction; and that as a result, plaintiffs purchased the partnership interests for more than they were worth and sustained damages.

*Background Facts*

On this motion for summary judgment, the following background facts are undisputed. Since the early 1940's, plaintiff Kohns had been the managing general partner at Hirsch & Co., and by 1965, he had become in practical fact, the chief operating officer, with responsibility for all aspects of Hirsch & Co.'s business. Mundheim assisted Kohns in these duties, in addition to having "direct responsibility" for the firm's foreign and commodity business, while plaintiff Howard C. Hirsch, as senior partner, had assumed a less active role as "counselor" to Hirsch & Co. (Kohns Tr. 6–8; Mundheim Tr. 9, 11–13).[2] The general partners of Hirsch & Co. decided upon the "merger" with duPont and Glore Forgan, Staats, Inc. ("Glore"), the third firm involved in the merger, because they believed that a medium-sized firm such as Hirsch & Co. could not survive in Wall Street. (Mundheim Tr. 45; Kohns Tr. 41–42). Glore would contribute its strong underwriting department to the new firm (Kohns Tr. 99), while Hirsch & Co. would bring in its substantial European business. (Kohns Tr. 128). Hirsch and Mundheim also viewed the merger as a means of reducing their activities or retiring while perpetuating the business of Hirsch & Co. (Hirsch Tr. 49; Mundheim Tr. 47–48; Kohns Tr. 43). For this reason, Mundheim testified, he preserved an option under the agreement with the new firm to withdraw his capital and retire after six months. (Mundheim Tr. 212, 290). Kohns felt quite differently, wishing to remain active in the new firm and "die with his boots on." (Kohns Tr. 43).

On July 2, 1970, the Hirsch & Co. partners entered into an agreement with duPont ("the Agreement"), and Articles of Limited Partnership ("Articles") of the new partnership, duPont Glore, were adopted. Under the Agreement, duPont purchased certain of the assets and assumed certain of the liabilities of Hirsch & Co. (Agreement, p. 1). In payment for the assets, duPont credited certain Hirsch & Co. assets to the accounts of

---

1. As more fully set forth below, Kohns and Mundheim also purchased limited partnership interests and other interests.

2. The references are to pages of the transcripts of the depositions of the indicated persons.

the former Hirsch partners who became general, limited or "special"[3] partners of duPont and then of duPont Glore, as their respective capital contributions to duPont and duPont Glore.[4] (Agreement § 5(a) ). On the closing date, Kohns and Mundheim were admitted as general partners of duPont and duPont Glore. (Agreement § 6). In the course of these transactions, the plaintiffs' accounts in duPont Glore were credited with the following amounts:[5]

|  | General Partnership Interests | Limited Partnership Interests |
|---|---|---|
| Hirsch | — | $400,000 |
| Kohns | $307,000 | $593,000 |
| Mundheim | $307,000 | $593,000 |

Kohns and Mundheim's general partnership interests represented 35 and 33 "voting units" respectively, out of a total of 1,365 voting units.

The new firm had 74 general partners and several limited partners, assets of $400 million and total capital funds of $60 million. (Camhy Affidavit, ¶ 2).

In September, 1970, two months after its formation, the new firm was not in compliance with Exchange capital requirements. As a result of the Exchange's demands, new reserves had to be created, reducing the firm's net worth by $15 million. (Camhy Affidavit, ¶ 3). Despite a contribution of capital from a group including H. Ross Perot, the financial condition of duPont Glore continued to deteriorate, and in December, 1970, Kohns and Mundheim were told that if they attempted to withdraw their capital the firm would be unable to pay it. Accordingly, Mundheim and Kohns became subordinated lenders of duPont Glore on December 14, 1970, and December 31, 1970, respectively. (Mundheim Tr. 364; Kohns Tr. 4).

*Discussion.*

## II.

Summary judgment should be granted where the pleadings, depositions and affidavits filed in the case "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P.; *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). On this motion, the material facts are undisputed; and the issue of whether, on the basis of those facts, the general partnership interests were "securities" is a question of law which may be resolved by the court on summary judgment. Jennings and Marsh, *Securities Regulation*, 294 n. a (3d ed. 1972); *cf. S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244, 1251 (1946) (Frankfurter, J., dissenting).

Defendants' principal contention is that Kohns and Mundheim, as general partners, received and exercised the right to participate actively in the management and control of duPont Glore, and that for this reason, their general partnership interests did not constitute "securities," as that term has been defined in the statutes and decisional law.

Before discussing defendants' contention, it would be well to consider the argument that the nature of Kohns' and Mundheim's participation after July 2 in duPont Glore, the successor partnership, is immaterial since the fraud was allegedly perpetrated *before* plaintiffs became general partners in order to induce them to purchase their interests, and the misrepresentations concerned the financial condition of duPont, one of the *predecessor* partnerships. With respect to plaintiffs' general part-

---

3. "Special partners" were limited partners who also held positions as employees in du-Pont Glore. (Article 1st).

4. The balance of the purchase price was to be paid to the "liquidating committee" of Hirsch & Co.

5. Affidavit of Sheldon D. Camhy, sworn to April 4, 1975, ¶ 2.

nership interests,[6] I deem these considerations irrelevant to the analysis that must be made under §§ 10(b) and 17(a). Section 10(b) prohibits fraud only if it is "in connection with the purchase or sale of any security * * *." Section 17(a) prohibits fraud only if it is "in the offer or sale of any securities * * *." The Agreement and affidavits clearly show that the individual plaintiffs' only participation in the July 2 transaction was as *purchasers* of general and limited partnership interests.[7] Thus in order to recover under § 10(b) or § 17(a), Kohns and Mundheim must establish that those interests were "securities." As the discussion below indicates, that issue turns on the nature of the investor's participation in the enterprise *after* he purchases his interest. *S.E.C. v. W. J. Howey Co., supra*, 328 U.S. at 198–99, 66 S.Ct. 1100. In every case in which plaintiff purchases an interest in an enterprise for the first time, he obviously has no participation *before* the purchase. But in none of the cases cited below is it suggested that that fact is relevant to the issue of whether the interest purchased is a security:

Since the general partnership interests were not conventional securities such as shares of corporate stock, it must be determined whether they constituted "investment contracts" within the meaning of § 2(1) of the 1933 Act and § 3(a)(10) of the 1934 Act.[8] The classic definition of an "investment contract" is given in *S.E.C. v. W. J. Howey Co., supra,* where the United States Supreme Court held that an offering of units of a citrus grove development coupled with a contract whereby the management performed all cultivating and marketing services and remitted the proceeds to the investors constituted an offering of "investment contracts":

"In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise *and is led to expect profits solely from the efforts of the promoter or a third party * * *."* 328 U.S. at 298–99, 66 S.Ct. at 1103. (Emphasis added)

One element of this definition has caused considerable controversy. That element is the requirement that the investor rely for profit *"solely"* on the efforts of others. Some subsequent cases have found this apparently narrow, inflexible requirement to be inconsistent with the *Howey* opinion's own admonition, 328 U.S. at 299, 66 S.Ct. at 1103, that its definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *See S.E.C. v. Glenn W. Turner Enterprises, Inc.,* 348 F.Supp. 766, 774 (D.Or.1972), *aff'd,* 474 F.2d 476 (9th Cir. 1973). Other courts have noted that in some of the state law cases relied on by *Howey, e. g., State v. Gopher Tire & Rubber Co.,* 146 Minn 52, 177 N.W. 937 (1920), the investors contributed nominal efforts to the enterprise, and these courts have interpreted *Howey* not to preclude the finding of a security where the investor is required to perform nominal services or physical labor. *S.E.C. v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 480 (5th Cir. 1974); J. Long, *Partnership, Limited Partnership, and Joint Venture Interests as Securities,*

---

6. As stated below, these considerations are relevant to the issue of whether the fact that plaintiffs were general partners deprived their limited partnership interests of their character as securities.

7. The Agreement refers to purchases of interests in duPont, but at the same time plaintiffs purchased their interests, duPont became duPont Glore. Plaintiffs stated that they "invested monies in F.I. duPont Glore Forgan & Co." (Kohns Affidavit, ¶ 2) not in duPont.

8. The definitions in the two acts are "virtually identical," Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 546 (1967), and authorities construing one definition are apposite to the construction of the other.

37 Mo.L.Rev. 581, 599 n. 73 (1972). The primary concern in this regard has been that if the *Howey* requirement is interpreted literally, *see, e. g., Gallion v. Alabama Market Centers, Inc.*, 282 Ala. 679, 213 So.2d 841 (1968); *Georgia Market Centers, Inc. v. Fortson*, 225 Ga. 854, 171 S.E.2d 620 (1969) (requirement that investors hand out "purchase authority" cards to potential customers in order to earn commissions precluded finding of security),[9] the test could easily be evaded by requiring the investor to contribute a modicum of effort. *Lino v. City Investing Co.*, 487 F.2d 689, 692–93 (3d Cir. 1973); *S.E.C. v. Glenn W. Turner Enterprises, Inc., supra*, 474 F. 2d at 482; *see Scholarship Counselors, Inc. v. Waddle*, 507 S.W.2d 138 (Ct.App. Ky.1974); *State of Utah v. Dare to Be Great, Inc.*, 3 CCH Blue Sky L.Rep. ¶ 71,096 (Dist.Ct.Utah 1972) (questioning whether *Howey* would have been decided differently if the contract had required the investor "to appear once a year to pull weeds along his row of trees.")

Finally, some courts have stated that the reason *Howey* excluded the investor who participates in the enterprise from the protection of the disclosure and fraud provisions of the securities laws is that an investor does not need such protection where he obtains a degree of managerial control which affords access to information about the issuer. *Polikoff v. Levy*, 55 Ill.App.2d 229, 204 N. E.2d 807, *cert. denied*, 382 U.S. 903, 86 S.Ct. 237, 15 L.Ed.2d 156 (1965); *In the Matter of Continental Marketing Associates, Inc.*, 3 CCH Blue Sky L.Rep. ¶ 71,016 (Ind.Sec.Comm'n 1969). The fact that the investor performs nominal services or physical labor gives him no access whatever to information about the issuer and affords no reason for depriving him of the protection of the securities laws.

For all of these reasons, the SEC,[10] state securities commissions,[11] and many state[12] and lower federal courts have refused to apply *Howey* literally. It has also been suggested, erroneously in my opinion, that the Supreme Court has, *sub silentio*, abandoned the *Howey* test. *See S.E.C. v. Koscot Interplanetary, Inc., supra*, 497 F.2d at 481.[13]

9. There has been a fruitful exchange on the issue of the definition of a security between state courts interpreting blue sky laws and federal courts interpreting the federal statutes. *See* SEC v. Glenn W. Turner Enterprises, Inc., *supra*, 348 F.Supp. at 773.

The definition of "security" in most of the blue sky laws is similar to that in §§ 2(1) and 3(a)(10). Long, *Partnership Interests as Securities, supra*, at 584 n.15. Although the blue sky decisions are by no means controlling, their analyses may shed light on our problem.

10. Sec. Act Rel. 4877, CCH Fed.Sec.L.Rep. ¶ 77,462 (1967); Sec. Act Rel. 5211, CCH Fed.Sec.L.Rep. ¶ 78,446 (1971).

11. In the Matter of Continental Marketing Associates, Inc., *supra*; Op. of Atty.Gen. of Tenn. No. 27, 3 CCH Blue Sky L.Rep. ¶ 71,164 (1974).

12. Scholarship Counselors, Inc. v. Waddle, *supra*; State of Utah v. Dare to Be Great, *supra*.

13. The court in Koscot, *supra*, noted that in S.E.C. v. United Benefit Life Insurance Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), Mr. Justice Harlan did not cite Howey, but relied instead on S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), in holding that variable insurance was subject to the registration requirements of the 1933 Act.

The reason for Justice Harlan's failure to cite Howey may have been that the opinion focused primarily on the issue of whether the variable insurance qualified for the "optional annuity" exemption from registration under § 3(a)(8) of the Securities Act, 15 U.S.C. § 77c(a)(8). The issue of whether the contract was a security was secondary. Joiner lays special emphasis on the issuer's representations. Justice Harlan cited it in support of his conclusion that since issuers of variable insurance represented that their contracts offered much the same opportunity for growth through professionally managed investment as mutual funds, purchasers of variable insurance should be provided with the same disclosure through registration as an investor in a mutual fund.

Any notion that the Supreme Court abandoned Howey in United Benefit is erased by a reading of Tcherepnin v. Knight, *supra*,

However, despite the rejection of *Howey* in other jurisdictions, decisions of this district and circuit until recently [14] followed it and gave no indication that the *Howey* test would not be applied literally.[15] *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1035 (2d Cir. 1974); *Forman v. Community Services, Inc.*, 500 F.2d 1246, 1253–54 (2d Cir. 1974), *cert. granted*, 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975); *Berman v. Orimex Trading, Inc.*, 291 F.Supp. 701, 702 (S.D.N.Y. 1968) (discretionary trading account); *Maheu v. Reynolds & Co.*, 282 F.Supp. 423 (S.D.N.Y.1967) (joint commodity account). In *Glen-Arden Commodities, Inc. v. Costantino, supra*, the Second Circuit said in reference to the *Howey* definition:

"This long-term construction placed upon an act of Congress is hardly one that we could disturb even if we wanted to, at this late date." 493 F.2d at 1035.

█ Turning to the general partnership interests in the present case, it is clear that a partnership interest may be a security, *Pawgan v. Silverstein*, 265 F.Supp. 898 (S.D.N.Y.1967); 1 L. Loss, *Securities Regulation*, 502 (2d ed. 1961); but, as I understand the law in this circuit, the partnership interest must satisfy the *Howey* test. *New York Stock Exchange, Inc. v. Sloan*, 394 F. Supp. 1303 (S.D.N.Y.1975); *see also Pawgan v. Silverstein, supra*, 265 F. Supp. at 900. In *New York Stock Exchange, Inc. v. Sloan, supra*, at 1314, this court (Lasker, J.), applying *Howey*, adopted a bright-line rule that "general partners are not investors in 'securities'." The court said that this conclusion would not vary according to the degree of actual participation by the part-

ner in the firm's affairs, because, under the New York partnership statute, neither his responsibility for the acts of the firm nor his right to a voice in partnership matters could be diminished by his decision to delegate his duties:

"In our view, however, the determination whether the partnership interest of a general partner is a security does not and should not hinge on the particular degree of responsibility he assumes within the firm. The fact that a partner may choose to delegate his day-to-day managerial responsibilities to a committee *does not diminish in the least his legal right to a voice in partnership matters, nor his responsibility under state law for acts of the partnership.* See N.Y. Partnership Law §§ 10, 11, 26. These factors critically distinguish the status of a general partner from that of the purchaser of an investment contract who in law as well as in fact is a 'passive' investor." 394 F.Supp. at 1314. (Emphasis added)

█ I agree in substance with this reasoning, and on the authority of *Sloan*, hold that the general partnership interests in the present case are not securities. As noted below, this conclusion would be justified if the only evidence before the court on this issue concerned the general partners' participation in duPont Glore by virtue of the *voting* powers inherent in their general partnership interests. Since Judge Lasker's opinion in *Sloan* apparently considers only voting powers, I will confine the present discussion to the voting powers of general partners in duPont Glore, leaving until a later section consideration of the managerial powers exercised by Kohns and Mundheim by virtue of

---

decided the following year, where the Court strongly reaffirmed the Howey test.

14. The *dictum* in 1050 Tenants Corp. v. Jakobson, 503 F.2d 1375, 1378 n.5, (2d Cir. 1974), is discussed below.

15. This circuit has apparently not been faced with the plethora of franchising and get-

rich-quick pyramiding schemes which involve nominal efforts by the investor and which have created the pressure for a relaxation of the Howey rule in other circuits. Most of the interests examined by the courts here have been found to be securities even under a literal construction of Howey.

their membership on various committees at duPont Glore.

Before considering the voting powers in the present case, however, it should be noted that Judge Lasker's reasoning in *Sloan* does not apply to all general partnerships organized under New York law. It is true that under §§ 40(5) and 98(1), N.Y. Partnership Law, "[a]ll [general] partners have equal rights in the management and conduct of the partnership business * * *."[16] But this right is "subject to any agreement between them." § 40, N.Y. Partnership Law; *see Dore v. LaPierre*, 226 N.Y.S. 2d 949, 953 (Sup.Ct.1962); *Napoli v. Domnitch*, 34 Misc.2d 237, 248, 226 N. Y.S.2d 908, 915 (Sup.Ct.), *modified on other grounds*, 18 A.D.2d 707, 236 N.Y. S.2d 549 (2d Dept.1962), *aff'd*, 14 N.Y. 2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 (1964). The partnership agreement or articles may provide that certain general partners have no "legal right to a voice in partnership matters," and, in such case, the general partnership interest may constitute an investment contract under the test set forth in *Howey*. Professor Bromberg has written:

> "In theory, general partners have equal rights to participate in management. CRANE & BROMBERG ON PARTNERSHIP 374–375 (1968). This would seem to preclude one from relying solely on another for profits, and thus to rule out an investment contract. But the theoretical principle may be varied by the agreement of the partners, which may lodge all control in designated partners." 1 A. Bromberg, *Securities Law: Fraud*, Sec. 4.6 (331) (1973); Jennings and Marsh, *supra*, at 308.

Thus in *Pawgan v. Silverstein, supra*, 265 F.Supp. at 900, where the articles of the general partnership vested all managerial and operational authority in the three "managing partners," this court (Metzner, J.) held that the interests of the 17 non-managing general partners were "securities."

However, unlike in *Pawgan*, the Partnership Articles and Agreement in the present case provide that the general partners, through the exercise of their voting powers, are to have complete managerial control of the business of duPont Glore. Therefore, under the *Howey* test, as applied in *New York Stock Exchange, Inc. v. Sloan, supra*, the general partnership interests in the present case are not securities. Although, as noted below, certain responsibilities were delegated to several committees and a managing director, Article 21st vested the power of decision as to the firm's policies, management, and "any matter whatsoever" in a majority in interest[17] of the general partners:

> "TWENTY-FIRST: In the event of any dispute or difference of opinion as to policies of the partnership or as to the management of its business or any matter whatsoever in connection with the conduct thereof, the final power of decision shall, subject to the provisions of these partnership articles,[18] be vested in a majority in interest of the general partners, and each partner hereby agrees to abide by any decision so made. * * *"

The general partners also had the power to appoint and remove the managing director and any member of any committee. (Article 19th (b), (c)). In addition to their general overall managerial control, the general partners had power to determine partners' salaries; to admit general and limited partners; to require a general partner to withdraw;

---

16. I do not believe that the investor's "responsibility * * * for acts of the partnership" mentioned by the court in Sloan is an important determinant under the Howey test of whether the interest is a security. It may have some relevance under the "risk-capital" test mentioned below.

17. For purposes of determining a "majority in interest," the interest of each general partner was based on the number of voting units he held. (Article 1st).

18. There was no provision which gave any officer or person the power to override the decision of the general partners as to the management and operation of the firm.

and to increase or decrease the membership of any committee. (Articles 8th (3), 12th, 13th, 19th (d)). In addition, they had the right to inspect the partnership and committee records. (Articles 15th, 19th (e)). I adopt the reasoning of *New York Stock Exchange v. Sloan, supra,* that since, under the Partnership Articles, substantial "legal right[s] to a voice in partnership matters" inhered in the general partnership interests, those interests were *not* securities, irrespective of the degree to which Kohns and Mundheim actually chose to exercise their rights.

I do not agree with plaintiffs' reasoning that they exercised no control over the firm because they held a minority of the total voting units [19] and they might be defeated by an opposing majority on some issues. In fact, no individual held a majority.[20] Of the 74 general partners, Kohns and Mundheim were the sixth and seventh largest holders of voting units, respectively. They were clearly in a position to seek a majority for their position, and thereby exercise managerial control over the firm.

I hold that Kohns and Mundheim's interests were not securities under the *Howey* and *Sloan* tests on the basis of the facts set forth above. The difficulties attributed to the *Howey* test are not present here. The general partners' rights and duties under the Partnership Articles were not merely "nominal" and were not given to the general partners merely as a means of evading the strict *Howey* test. Moreover, by virtue of their managerial powers and express rights of inspection, they could inform themselves as to the condition of the business and, through their efforts, promote its success.

### III.

Not only do the general partnership interests in this case fail to meet the

*Howey* test; they do not even satisfy certain of the more liberal definitions of "securities" adopted in jurisdictions which have abandoned or relaxed the *Howey* test.

Certain state courts have rejected the *Howey* test altogether, and, following *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961), have held that an investor's interest is a security if the investor places his capital at the risk of the enterprise and receives some benefit in exchange.[21] *Accord, In the Matter of the State of Alaska Department of Commerce v. Spa Athletic Club, Inc.,* 3 CCH Blue Sky L.Rep. ¶ 71,136 (Alaska Dept. of Commerce 1974); *Lundquist v. American · Campground Memberships, Inc.,* 3 CCH Blue Sky L.Rep. ¶ 71,196 (Wash.Super.1973); *People v. Witzerman,* 29 Cal.App.3d 169, 105 Cal.Rptr. 284 (1972); *contra, Brown v. Computer Credit System, Inc.,* 128 Ga.App. 429, 197 S.E.2d 165 (1973); *see* Long, *Partnership Interests as Securities, supra,* at 603–04. In *Sobieski,* Justice Traynor of the California Supreme Court stated the rationale of the "risk capital" test as follows:

> "Since the [California] act does not make profit to the supplier of capital the test of what is a security, it seems * * * that *its* objective *is* to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures whether or not they expect a return on their capital in one form or another." 13 Cal.Rptr. at 188, 361 P.2d at 908–909.

Under this test, virtually every conceivable investment, including the general partnership interests in the present case, would qualify as securities. However, no federal court has adopted the "risk capital" test.

---

19. Together they held approximately 5% of the voting units.

20. Edmond duPont held 36% of the voting units.

21. *Sobieski* involved an offering of memberships in a country club. The "risk capital" test was created to overcome the difficulty that purchasers of such memberships did not receive any pecuniary "profit" as *Howey* apparently requires.

Certain state and federal decisions have, however, combined the "risk capital" test with a modified version of the *Howey* definition. In *State v. Hawaii Market Center, Inc.*, 485 P.2d 105 (Hawaii 1971), the court held that an investment contract is created where four requirements are satisfied:

"(1) an offeree furnishes initial value to an offeror, and

"(2) a portion of this initial value is subjected to the risks of the enterprise, and

"(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and [22]

"(4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise." 485 P.2d at 109.[23]

See *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, supra, 348 F.Supp. at 374–75; *Venture Investment Co. v. Schaefer*, 3 CCH Blue Sky L.Rep. ¶ 71,031 (D. Colo.1972) (Colorado Uniform Securities Act); *State ex rel. Park v. Glenn Turner Enterprises, Inc.*, 3 CCH Blue Sky L. Rep. ¶ 71,023 (Idaho Dist.Ct.1972); *State ex rel. Fisher v. World Market Centers, Inc.*, 3 CCH Blue Sky L.Rep. ¶ 71,034 (Okla.Dist.Ct.1972).

The first three requirements are relatively easily met, and attention has focused on the fourth requirement: the absence of "the right to exercise practical and actual *control over the managerial decisions of the enterprise.*" (Emphasis added).

Indeed, after the *Hawaii Market Center* decision, the federal courts in several circuits adopted this fourth requirement, the absence of *managerial* control, as the single test of an investment contract. *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, supra, 474 F.2d at 482 (9th Cir. 1973); *S.E.C. v. Koscot Interplanetary, Inc.*, supra, 497 F.2d at 483 (5th Cir. 1974); *Nash & Associates, Inc. v. Lum's of Ohio, Inc.*, 484 F.2d 392, 395 (6th Cir. 1973);[24] see also *In the Matter of Continental Marketing Associates, Inc.*, supra; *Shaul v. Consumer Companies of America, Inc.*, 3 CCH Blue Sky L.Rep. ¶ 71,022 (Ohio C.P.1972). The leading case of *S.E.C. v. Glenn W. Turner Enterprises, Inc.* stated this new test as follows:

"Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, *those essential managerial efforts which affect the failure or success of the enterprise.*" 474 F.2d at 482. (Emphasis added)

The SEC has also adopted the position that an interest is a security only where

---

22. In including this element in the test, the court may have been influenced by the United States Supreme Court's holding in S.E.C. v. C. M. Joiner Leasing Corp., *supra*, 320 U.S. at 352–53, 64 S.Ct. at 124, where the Court laid special emphasis on the representations made to the investor:

"The test * * * is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be."

23. In Sec. Act Rel. 5211, CCH Fed.Sec.L. Rep. 78,446 at 80,976 (1971), the SEC stated that "the court's analysis of the investment-contract concept in the *Hawaii Market Center* case is equally applicable under the federal securities laws."

24. Lino v. City Investing Co., *supra*, 487 F. 2d at 693, seems to focus on the *quantum* of effort required of the investor, rather than on its *quality* as managerial or non-managerial effort. Thus the court held that a contract under which the investor gained the right to find and train franchise distributors for a commission was not a security because the investor was required to make significant sales efforts, open a sales center, and devote full time to finding and training franchise distributors.

there is "no active participation in the *management and operation* of the scheme on the part of the investor." Sec.Act Rel. 4877, CCH Fed.Sec.L.Rep. ¶ 77,462 (1967) (emphasis added). In Sec.Act Rel. 5211, CCH Fed.Sec.L.Rep. 78,446, the Commission stated, with specific reference to pyramiding schemes:

"The term 'security' must be defined in a manner adequate to serve the purpose of protecting investors. The existence of a security must depend in significant measure upon the degree of managerial authority over the investor's funds retained or given; and performance by an investor of duties related to the enterprise, even if financially significant and plainly contributing to the success of the venture, *may be irrelevant to the existence of a security if the investor does not control the use of his funds to a significant degree. The 'efforts of others'* referred to in *Howey* are limited, therefore, to those types of *essential managerial* efforts but for which the anticipated return could not be produced." (Emphasis added)

Adoption of this liberal version of the *Howey* test may be justified by language in the *Howey* opinion itself which suggests that the "efforts" to which the Court referred were managerial efforts.[25] Long, *Partnership Interests as Securities, supra,* at 601–02. This test reduces the possibility of evasion by inclusion of a provision requiring the investor to contribute nominal efforts. Moreover, it is consistent with the above-mentioned view that where the investor obtains managerial control and thereby gains access to information about the issuer, he has less need of the protection of the fraud and disclosure provisions of the securities laws.

Although, as noted, the decisions in this circuit had previously adhered to a literal interpretation of *Howey*, the Court of Appeals in *1050 Tenants Corporation v. Jakobson, supra,* 503 F.2d at 1378 n. 5, suggested in *dictum* [26] that it was willing to go beyond the most liberal definition of an investment contract in other circuits. Thus the court said that even if the investor participates to a small degree in the *management* of the enterprise, his interest may qualify as a security:

"Even if the shareholder-tenants of 1050 Corp. were to assume some small role in the management of the venture, that alone would not defeat the *Howey* 'reliance' requirement." [citations omitted]. 503 F.2d at 1378 n. 5.[27]

The general partnership interests in the present case do not constitute securities under the "nonmanagerial efforts" test of *S.E.C. v. Glenn W. Turner Enterprises, Inc., supra,* or even according to the above-quoted statement from *Jakobson,* whether or not it correctly states the law in this circuit. Plaintiffs have contended that the real power was lodged in Edmond duPont, Wallace C. Latour and Erwin B. Peterson. Curiously, plaintiffs attribute these three individuals' power partly to their membership on the Special Committee of the Partners. (*See, e. g.,* Affidavit of Paul

---

25. In Howey, the Court said:

"Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; *the promoters manage, control, and operate the enterprise.*" 328 U.S. at 300, 66 S.Ct. at 1104. (Emphasis added)

26. The court first held that shares in a cooperative were "stock" and therefore securities. The court held alternatively that the shares were also investment contracts since "the requirement that expectations of profit derive 'solely from the efforts of the promoter[s] or a third party', 328 U.S. at 299, 66 S.Ct. 1100, (footnote omitted) is clearly satisfied here." Thus the court's hypothetical concerning a "small role" in management is clearly *dictum.*

27. It is questionable whether this statement is supported by prior authority. In the first case cited in support of it, it was found that the interest in question was *not* a security because of the *quantum* of non-managerial effort required of the investor. That holding does not support the position taken by the court in the quoted statement.

L. Kohns, sworn to April 1, 1975, ¶ 9.) However, the Partnership Articles show that this committee was authorized to perform only such ministerial acts as filing powers of attorney on behalf of the partnership, adopting the use of a mechanical signature and things of like nature. (Article 20th).

Indeed the undisputed facts presented on this motion, consisting largely of plaintiffs' own deposition testimony, clearly establish that both Kohns and Mundheim had a very substantial degree of managerial responsibility and control at duPont Glore.

I have already mentioned the *voting* rights and powers exercised by Kohns and Mundheim. In addition, and perhaps most important, Kohns and Mundheim were members of the eight-man Finance Committee. (Kohns Affidavit, ¶ 9; Exhibit E to Camhy Affidavit).[28] They were entitled to membership on this and all other committees by reason of their position as general partners. (Article 19th(c)). The Partnership Articles enumerate several of the functions of this committee, including: the determination of the rate of return to each limited partner on his cash contribution and the return to each general partner on both cash and noncash contributions; the approval of withdrawals of net profits; the approval of the contribution or withdrawal of additional capital by partners; the approval of capital contributions in the form of "Secured Capital Notes"; the determination of whether to hold or sell securities contributed as capital or pledged as collateral; and the valuation of certain securities. (Articles 8th, 4th(a), (b), 7th, 4th(e), 6th (e) and 22nd).

However, the most emphatic statement of the importance of the Finance Committee and hence of Kohns and Mundheim's managerial powers in the firm appears in Kohns' deposition:

"Q. What was the function of the finance committee?

"A. It was the top authority and it was the executive group that ran the firm. It was the senior—it was the policy making group." [29] (Kohns Tr. 298)

As two of the eight general partners on this senior policy-making committee than ran the firm, Kohns and Mundheim had powerful managerial positions which far exceeded in importance the "small roles" in management mentioned in *Jakobson, supra.*

In addition, after he became a partner, Mundheim filled a vacancy on the Executive Committee which is charged by the partnership articles with "general * * * management of the partnership and the conduct of its affairs." (Article 19th(b)(iii).

I attach less importance to Kohns and Mundheim's membership on the 24-man Board of Directing Partners which, under the Articles, was to "review" all actions taken by the other committees and the managing director. (Article 19th(b)(i)). This committee was largely honorary and, according to Kohns, "did not involve any work whatsoever." (Kohns Tr. 199; Kohns Affidavit, ¶ 9; Camhy Affidavit, ¶ 7). Nonetheless, the members did gain information about the firm through this committee (Kohns Tr. 199); and Kohns did have the responsibilities of a member of the task force on reducing costs to which he was appointed on July 15, 1970. (Kohns Tr. 235).

The undisputed facts also show that each of the plaintiffs' positions at the firm was a full-time occupation. I deem it to be of no significance that the Agreement does not *require* either to

---

28. I consider it immaterial that Mundheim claims not to have been a member of this committee immediately after joining duPont Glore. Exhibit E to the Camhy affidavit shows that he was a member on July 23, 1970, just three weeks after consummation of the merger. (*See* Mundheim Tr. 299).

29. The court does not believe that Kohns' subsequent, self-serving attempt to mitigate the effect of this admission (See Kohns Affidavit, ¶ 9) raises a genuine issue of material fact.

perform specific duties in exchange for their salaries of $36,000. (Agreement § 7). It is undisputed that both had the *right* to participate actively in the firm's business and that both exercised that right.

Despite his intention eventually to retire, Mundheim agreed to remain active for at least six months (Mundheim Tr. 290), and he was given the supervision of the foreign office (Mundheim Tr. 299), a position similar to the one he had held at Hirsch & Co.

Consistent with his determination to "die with his boots on," Kohns was active and came into the office regularly during the summer and fall of 1970, except during the time he was on vacation. (Kohns Tr. 237.).[30]

For all the reasons stated above, the interests in question were not securities according to the criteria set forth in *S. E.C. v. Glenn W. Turner Enterprises, Inc., supra*, and *1050 Tenants Corp. v. Jakobson, supra*.

## IV.

Some decisions, including one from this district, have stated that the proper test of whether a partnership interest is a security is whether or not the issuer is a "bona fide" partnership or a partnership "in the accepted sense." *Pawgan v. Silverstein, supra*. According to these decisions, a "bona fide" partnership interest cannot be a security.

The state blue sky decisions adopting this test, *e. g., Rivlin v. Levine*, 195 Cal. App.2d 13, 15 Cal.Rptr. 587 (1961); *Garbo v. Hilleary Franchise Systems,*

*Inc.*, 479 S.W.2d 491 (Mo.App.1972), have found several attributes of most securities to be inconsistent with the concept of a partnership.[31] Chief among these are the fact that many securities may be transferred without the approval of other security holders of the same issuer; the fact that most securities can be offered to the public; and the fact that holders of the securities of one issuer frequently have no personal relationship with one another. Long, *Partnership Interests as Securities, supra*, at 588, 605.

The courts and commentators have focused on the first criterion: that is, whether each partner has the right to approve or disapprove the admission of new members to the partnership or the transfer of partnership interests.[32] *See Rivlin v. Levine, supra*; 1 Loss, *supra*, at 502–506; 4 Loss, *supra*, at 2551; Long, *Partnership Interests as Securities, supra*, at 606.

The general partnership interests in duPont Glore were not securities according to these three criteria. The interests were not offered to the public, and Kohns and Mundheim had a day-to-day working relationship with the other general partners. Although *each* partner did not retain the right to disapprove new partners, *see* § 40(7), N.Y. Partnership Law, there was a degree of *delectus personarum*, since a majority in interest of the general partners was required to approve the admission of new general partners. (Article 12th).

The federal courts have apparently applied the *Howey* test in the light of

---

30. I again take the view that Kohns' later contradictory affidavit made with this motion in mind does not raise a genuine issue of fact.

31. In certain decisions where it was found that the interest in question was a security under the Howey test, the court felt that this necessitated a finding that the issuer was not a partnership under state partnership law. *E. g.*, Garbo v. Hilleary Franchise Systems, Inc., *supra*. However, under the Uniform Limited Partnership Act, adopted in New York State, an interest may qualify as a limited partnership interest even though it

is freely transferable and is publicly offered to people with no personal relationship to one another. Long, *Partnership Interests as Securities, supra*, at 588.

The bona fide partnership test may be based on the time-honored blue-sky rule that a "joint adventure" is not a security. *See* Pollikoff v. Levy, *supra*; Cross v. Pasley, 270 F.2d 88, 92 (8th Cir. 1959), *cert. denied*, 362 U.S. 902, 80 S.Ct. 608, 4 L.Ed.2d 554 (1960).

32. This is referred to throughout the literature as the right of *delectus personarum*

some or all of the three criteria of the bona fide partnership test. Thus in *Pawgan v. Silverstein, supra*, where non-managing general partners had no right to approve new partners and the general partnership interests were assignable, the court found that the general partnership was not "a partnership in the general sense." [33]

In *Vincent v. Moench*, 473 F.2d 430, 436 (10th Cir. 1973), the court held that interests in a partnership formed by three siblings and their families to operate a livestock business were not securities. In addition to finding that plaintiff had substantial control of the partnership, the court emphasized that there had been no public offering of the partnership interests and that the partners knew each other well and were bound together in a family relationship.

In the present case, as noted, all three requirements of a bona fide partnership are met. However, the most striking fact in regard to this test is that Kohns and Mundheim's participation in duPont Glore was their daily occupation and their profession. They had a professional and business relationship with the other general partners like that of a firm of accountants or lawyers. DuPont Glore was clearly a partnership "in the accepted sense," and this furnishes an alternative basis for finding that the general partnership interests were not securities.

### V.

■ In contrast to the general partnership interests, Kohns and Mundheim's *limited* partnership interests clearly satisfy the definition of a security.

■ Under New York partnership law, limited partners may not interfere "in any manner with the conduct or control of the partnership business." *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 535, 277 N.Y.S.2d 377, 383, 223 N.E.2d 869, 873 (1966); *Executive Hotel Associates v. Elm Hotel Corp.*, 41 Misc. 2d 354, 358–59, 245 N.Y.S.2d 929, 933 (1963). Their rights, as set forth in § 99 of the Partnership Law, are limited to the rights to receive a share of profits, to inspect partnership records, and to have dissolution of the partnership under certain circumstances.

Because limited partners must, by statute, rely solely on the efforts of others for their profit, limited partnership interests have been held to be securities in this district. *New York Stock Exchange, Inc. v. Sloan, supra*, 394 F.Supp. 1303 at 1311; *see Klebanow v. New York Produce Exchange*, 344 F.2d 294, 297 (2d Cir. 1965) (stating that the limited partner's status is analogous to that of the corporate shareholder). Moreover, such interests are routinely viewed as securities by the SEC in administrative proceedings, *see, e. g., American Plan Investment Corp.*, CCH Fed.Sec.L.Rep., ¶ 78,044 (1971) (no-action letter),[34] and the Commission has stated that the "formal controls" retained by most limited partners do not deprive the interest of its character as a security under the *Howey* test.[35] Sec.Act Rel. 4877, CCH

---

33. It is difficult to determine what factors were most important to the decision in Pawgan since the opinion incorporates the statement of facts in a related case, United States v. Silverstein, 237 F.Supp. 446 (S.D.N.Y.1965), and does not comment in detail on the significance of those facts.

In Pawgan, as noted, managerial control was vested in three "managing partners"; thus the interests also satisfied the Howey test of a security.

34. Rule 3a11–1 under the Exchange Act, 17 C.F.R. § 240.3a11–1, provides that a "limited partnership interest" is an "equity security" for purposes of §§ 12 and 16 of the Exchange Act. It is not clear that this definition applies to § 10(b). Weinberger v. New York Stock Exchange, Inc., 335 F.Supp. 139, 146 n.21 (S.D.N.Y.1971).

35. Under New York State law, limited partnership interests in real estate syndications are deemed to be securities. Reiter v. Greenberg, 21 N.Y.2d 388, 392, 288 N.Y.S.2d 57, 61, 235 N.E.2d 118 (1968); General Business Law § 352–e.

Fed.Sec.L.Rep. ¶ 77,462 (1967); 4 Loss, *supra*, at 2549.

Since the Partnership Articles of du-Pont Glore do not purport to give limited partners powers beyond those specified in the statute, the authorities cited above support the conclusion that Mundheim and Kohns' limited partnership interests were securities.

## VI.

Defendants assert that because Kohns and Mundheim were general partners and exercised the managerial powers inherent in their general partnership interests, their limited partnership interests cannot qualify as securities.

Neither side has cited any authority on this point. However, the Court of Appeals' recent decision in *Laupheimer v. McDonnell & Co., Inc.*, 500 F.2d 21 (2d Cir. 1974), while by no means directly in point, does suggest that plaintiffs' limited partnership interests may be considered separately from their general partnership interests. In *Laupheimer,* the plaintiff was allegedly induced by fraud to become an officer of the defendant, a member firm of the Exchange and the American Stock Exchange, and thereby to become a member of the exchanges himself. Shortly thereafter, plaintiff completed a purchase of the defendant brokerage firm's stock. The defendant sought to bar plaintiff's federal securities action and compel the plaintiff to arbitrate his fraud claims under the provisions of the exchanges' constitutions which require arbitration of claims between members of the exchanges and officers and shareholders of member corporations. The court held that plaintiff was not required to arbitrate his claims since the fraud "was perpetrated against appellant Laupheimer not as an officer of the firm, a member of the AmEx or a stockholder, but as an outsider who had capital desired by the firm." 500 F.2d at 25. The court emphasized that some of the misrepresentations had been made before plaintiff became an officer and

exchange member. Moreover, defendant had offered plaintiff the stock and the opportunity to become an officer as a "package"; thus it was immaterial that plaintiff had become an officer shortly before the purchase of stock was closed. *See Danford v. Schwabacher*, 342 F. Supp. 65 (N.D.Cal.1972), *appeal dismissed*, 488 F.2d 454 (9th Cir. 1973).

■ In the present case, the fraudulent inducements to purchase limited partnership interests were allegedly made before Kohns and Mundheim became general partners. Moreover, plaintiffs purchased their limited partnership interests at the same time as their general partnership interests, not after they had become general partners. In light of these facts, it may be concluded that the allegedly fraudulent inducements were made to plaintiffs and they purchased their limited partnership interests not as general partners, but as "outsider[s] who had capital desired by the firm." *Laupheimer, supra,* 500 F.2d at 25. I therefore conclude that plaintiffs' limited partnership interests may be considered separately from their general partnership interests purchased at the same time. Considered separately, the former are clearly securities.

An examination of the New York Partnership Law does not alter this conclusion, for under § 101(1), a general partner in a firm may also hold a limited partnership interest. Moreover, for purposes of the *Howey* test, all rights and powers to participate in the management of the firm derive from the general partnership, not the limited partnership, interests.

## VII.

■ Kohns and Mundheim contend that where, as here, a transaction involves a purchase of securities (the limited partnership interests) in addition to non-securities (the general partnership interests), the purchase of non-securities is covered by §§ 10(b) and 17(a) as a matter of substantive law. I reject this view. The leading case of *Errion v.*

*Connell,* 236 F.2d 447, 454 (9th Cir. 1956), cited by plaintiffs, holds only that in the situation above described, the court may exercise *pendent* jurisdiction over *state common law* claims concerning the non-securities. *Accord, Herpich v. Wallace,* 430 F.2d 792, 808 (5th Cir. 1970) (*dictum*); *Collins v. Rukin,* 342 F.Supp. 1282, 1284 (D.Mass.1972); *Tully v. Mott Supermarkets, Inc.,* 337 F.Supp. 834, 844 (D.N.J.1972).[36]

## VIII.

It is thus appropriate to consider whether the court should exercise pendent jurisdiction over Kohns and Mundheim's state law claims of fraud, misrepresentation and breach of fiduciary duty [37] concerning their *general* partnership interests as well as their other interests. The test of whether pendent jurisdiction *exists* is stated in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L. Ed.2d 218 (1966):

> "The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103 [, 53 S.Ct. 549, 77 L.Ed. 1062]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there

is *power* in federal courts to hear the whole. (footnote omitted)"

■ Whether the federal claims are substantial is to be determined on the basis of the pleadings, not upon the evidence ultimately introduced at trial. *A. H. Emery Co. v. Marcan Products Corp.,* 268 F.Supp. 289, 292 (S.D.N.Y.1967), *aff'd,* 389 F.2d 11 (2d Cir.), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L. Ed.2d 106 (1968). Here the federal securities claims in the complaint concerning plaintiffs' limited partnership interests are plainly substantial.

Moreover, the state and federal claims of fraud derive from a "common nucleus of operative fact," *viz.*: the alleged misrepresentations and omissions which allegedly induced Kohns and Mundheim to purchase both their general and limited partnership interests.

Finally, aside from the restrictions of federal jurisdictional requirements, Kohns and Mundheim would ordinarily be expected to try their interrelated state and federal fraud claims in a single action. Indeed, there is a strong federal policy to resolve all issues of a single controversy in one suit, *Tully v. Mott Supermarket, Inc., supra,* 337 F. Supp. at 844, and neither side would gain anything by requiring plaintiffs to bring two separate actions.

■ Not only does the court have *power* to determine the state law claims, but in the circumstances of this case, the court should plainly *exercise* its pendent jurisdiction. The paramount fact underlying this conclusion is that the

**36.** The Ninth Circuit has apparently now adopted the position urged by plaintiffs. Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970).

The only case in this district cited by plaintiffs does not support their position. In Sinva v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359, 367 (S.D.N.Y. 1966), one claim in a customer's complaint charged a broker with fraud involving non-securities and the customer's securities account. However, in refusing to dismiss the court did not adopt the position urged by plaintiffs. It merely applied the rule that

on a motion to dismiss, a claim will not be dismissed unless, taking the allegations of the complaint in the light most favorable to the plaintiff, it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the § 10(b) or § 17(a) claim.

**37.** The complaint nowhere contains the allegations of breach of contract by the Exchange referred to in plaintiffs' memorandum. For reasons set forth below, the court need not consider plaintiffs' contentions in this regard on the present motion.

case has been pending for three years, and this is literally the eve of trial.[38] Seventeen witnesses have been deposed; their testimony covers 2,850 pages. Over 450 exhibits were marked during the depositions, and thousands of others were examined. To dismiss plaintiffs' state law claims and require them to bring a separate action would be to waste the prodigious efforts of counsel in preparing for trial on these claims. This I am unwilling to do.

## IX.

Plaintiffs assert for the first time in their memorandum and affidavits on this motion that their complaint states claims under § 6(b) of the Exchange Act, 15 U.S.C. § 78f(b), for breach of the Exchange's duty to regulate its members. In reply, defendants note that the complaint, as it now stands amended, resulted from the Exchange's motion for a more definite statement. In its notice of motion, dated April 25, 1972, the Exchange asked specifically: "(b). What statute or principle of common law gives to plaintiffs a claim * * * against defendant * * *." In response, the affidavit of Richard Spinogatti stated: "In answer to [this] question, I assert that Section 10(b) * * * the rules and regulations * * * promulgated thereunder and Section 17 * * * are such statutes." By an order dated June 28, 1972, this court granted the Exchange's motion. Plaintiffs then filed the amended complaint which followed Spinogatti's assurances, and specified §§ 10(b) and 17 as the bases of plaintiffs' claims, but made no mention of § 6. Defendants contend that they would be prejudiced if plaintiffs were allowed to introduce a wholly new theory some three years after the amendment of the complaint and after all discovery has been completed.

There is no need to consider these contentions in the present posture of this litigation. There has been no motion by plaintiffs to amend the complaint to include a § 6 claim, and no motion to dismiss under Rule 12(b)(6) by defendants. The sufficiency of the complaint is not in issue. Insofar as the motion for summary judgment is directed to plaintiffs' federal claims, it seeks a judgment that on the undisputed facts plaintiffs may not maintain an action under § 10(b) or § 17(a).[39] I need not decide whether plaintiffs may recover on a § 6 claim[40] or have raised issues of fact as to some other theory in order to decide whether defendants are entitled to summary judgment dismissing certain claims under §§ 10(b) and 17.[41]

### Conclusion

Defendants' motions for summary judgment dismissing Kohns and Mundheim's claims under § 10(b) of the Exchange Act and § 17(a) of the Securities Act are granted solely with respect to Kohns and Mundheim's general partnership interests in duPont Glore. Defendants' motions for summary judgment dismissing plaintiffs' §§ 10(b) and 17(a) claims are denied with respect to plaintiffs' limited partnership interests. Defendants' motions are denied as to Kohns and Mundheim's pendent state law claims concerning both their general and their limited partnership interests. Plaintiffs' contention that the complaint states claims for a violation of § 6 of the Exchange Act and for breach of contract need not be reached.

So ordered.

38. The case has been on the court's calendar for some time, and it will be tried as soon as possible after the decision of this motion.

39. Although the notice of motion refers generally to "the alleged federal securities laws claims," defendants' memorandum makes clear that the motion is directed only to "claims * * * pleaded under Section 17 * * * and Section 10(b) * * *." (p. 1).

40. It should be noted that New York Stock Exchange Inc. v. Sloan, *supra* 394 F.Supp. 1303, held that a general partner of a member-brokerage firm may not maintain an action under § 6. I need not decide whether to follow Judge Lasker's decision on this motion.

41. If plaintiffs so choose they may request at trial to be allowed to amend their complaint or introduce proof in support of a § 6 claim.